212 N.J. Super. 608 (1986)
515 A.2d 1260
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LINDA PRUDDEN, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued September 9, 1986.
Decided October 1, 1986.
*611 Before Judges PRESSLER, GAULKIN and BAIME.
Felix R. Orraca, Assistant Deputy Public Defender, argued the cause for appellant (Alfred A. Slocum, Public Defender of New Jersey, attorney; Felix R. Orraca of counsel and on the brief).
Catherine A. Foddai, Deputy Attorney General, argued the cause for respondent (W. Cary Edwards, Attorney General of New Jersey, attorney; Donna Chin, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
Defendant was tried by a jury and was found guilty of murder (N.J.S.A. 2C:11-3), hindering the prosecution of another (N.J.S.A. 2C:29-3) and false swearing (N.J.S.A. 2C:28-2). The trial judge sentenced defendant to life imprisonment on the murder conviction. In addition, defendant was sentenced to a custodial term of five years on the hindering prosecution offense and 18 months on the false swearing conviction. All sentences are to run concurrently.
Defendant advances numerous arguments on appeal. Her principal contentions, however, are that the trial judge erred: (1) by admitting into evidence a letter written by the victim prior to his death in which he recounted his belief that defendant would attempt to harm him and (2) by permitting the State to introduce expert testimony relating to morphological footprint comparisons. We find that the decedent's letter was improperly admitted and that this error taints defendant's convictions for murder and hindering the prosecution of another. We are constrained to reverse those convictions and remand for a new trial. Since the judge's error had no impact on the false swearing count, we affirm that conviction.
We need not recite the facts at length. Defendant and Diane Downey were charged with murdering the latter's husband. *612 The same indictment charged defendant individually with hindering the prosecution of Downey and false swearing. The charges against defendant and Downey were severed for the purpose of trial. Downey was tried first and was convicted of murder. Although defendant was tried separately, much of the evidence presented in the Downey trial was also introduced against her. We thus refer to our opinion in State v. Downey, 206 N.J. Super. 382 (App.Div. 1986) for a full recitation of the circumstances surrounding the homicide and its aftermath.
The State's theory at both trials was that defendant and Downey were engaged in a long-standing lesbian relationship and that they murdered the victim to prevent him from interfering. In support of this theory, the State presented evidence that Downey had moved into defendant's residence and that the two shared the same bedroom. Defendant's husband, Raymond Prudden, did not object to this arrangement, because he was having an affair with Downey's sister. The State introduced into evidence a note written by Downey professing her love for defendant. The police discovered an unmailed Christmas card in defendant's automobile in which Downey, in vulgar terms, noted her contempt for the decedent.
The State presented additional evidence disclosing the victim's fear of the Pruddens and Downey. Specifically, the decedent suspected that the three were plotting against him. Over defense counsel's vigorous objections, the trial judge admitted into evidence an undated handwritten letter signed by the victim. Because of the importance of the letter, we quote it verbatim:
To Anyone, if anything happens to me or my kids you can go get, number one, Diane Downey, number two, Linda Prudden, number three, Ray Prudden. They are at 218 Hardy Avenue, Bound Brook, New Jersey, 356-8574. They would be the cause of it. Robert R. Downey. P.S. In the event of this letter opened I want my kids to have everything I have.
Defendant ultimately received the letter and turned it over to the police after her arrest. During the trial, the prosecutor read the note to the jury. Immediately thereafter, the trial judge offered a limiting instruction in which he apprised the *613 jury that the note could not be considered as "proof of the truth of its contents," but only to establish the decedent's state of mind prior to his death.

I
We first address defendant's contention that the trial judge committed reversible error by admitting into evidence the victim's note. We considered the admissibility of this evidence in State v. Downey, supra. There, we held that the letter constituted inadmissible hearsay and that its introduction substantially impaired Downey's right to a fair trial. Id. at 394-395. In the course of our opinion, we considered whether the letter fell within the purview of the state of mind exception codified in Evid.R. 63(12). We held that it did not. Id. at 390-394. We noted that "[t]he necessary predicate to admission of such evidence is that: a) the statement reflects a mental or physical condition of the declarant which constitutes a genuine issue in the case or b) the statement is otherwise relevant to prove or explain the declarant's conduct." Id. at 390. We found that neither evidentiary requisite was present. First, the victim's state of mind was not a relevant issue to be decided by the jury. "The important fact ... was the state of mind of the defendant, not that of the deceased." Id. at 391. Second, the letter was not relevant to prove or explain the victim's conduct. Ibid. In that regard, we pointed out that "[b]y its very terms... the rule is limited to statements offered to prove the declarant's conduct, not that of another person." Id. at 391. We thus held that the trial judge erred when he admitted the letter and the corresponding testimony of the decedent's mother concerning its existence.
We recognize that the facts here are slightly different. As we have mentioned, the trial judge in this case instructed the jury that the victim's note could not be considered as proof of the truth of its contents. According to the judge's instruction, the probative effect of the letter pertained solely to the jury's consideration of the decedent's state of mind. Also, *614 unlike State v. Downey, supra, the prosecutor here did not allude to the victim's note in his summation.
Nevertheless, we are firmly convinced that our holding in Downey is fully applicable and compels a reversal of defendant's conviction. In our view, the decedent's letter was improperly admitted. We are entirely unpersuaded by the State's argument that the trial judge's limiting instructions obviated the potential for undue prejudice. Contrary to the State's contention, the judge's instructions cannot fairly be construed as limiting the jury's consideration of this evidence to marital discord between the Downeys and their embittered relationship. Even were we to accept the State's strained characterization of the judge's charge, we would be compelled to reverse. The probative value of the victim's letter was far outweighed by its inflammatory nature. Evid. R. 4. See State v. Royster, 57 N.J. 472, 484 (1971); State v. Jordan, 197 N.J. Super. 489, 504 (App.Div. 1984); State v. Blanton, 166 N.J. Super. 62, 72 (App. Div. 1979), certif. den. 81 N.J. 265 (1979). There was no real dispute concerning the enmity between the Downeys. Defendant freely admitted that she and Downey had often argued with the victim. Against this factual backdrop, we are convinced that even had more precise limiting instructions been given, they would have been to no avail. The reverberating clang of the accusatory words contained in the letter "would drown all weaker sounds." Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 25, 78 L.Ed. 196, 202 (1933).
Nor was the error rendered harmless by the fact that the prosecutor did not refer to it in his summation. While it is true that the evidence against defendant was substantial, the compelling nature of the decedent's letter convinces us that a reversal is mandated. We cannot say with fair assurance that the jury was not substantially swayed by the evidence.

II
In view of our disposition, it is unnecessary for us to determine whether the opinion of the State's expert concerning *615 morphological footprint comparisons was properly admitted.[1] We merely add the following comments for future guidance.
The factual context within which the issue is raised can be briefly summarized. During the trial, substantial evidence was presented concerning the condition of the crime scene when the police first arrived at the Downey residence. In the course of their investigation, the police discovered a bloody footprint on a piece of paper in the bedroom where the attack on the victim had apparently commenced. Further investigation revealed another bloody footprint in the bathroom. It is undisputed that the individual who left the footprint was wearing socks, but no shoes. Thus footprint identification by way of comparison of dermatological ridges was impossible. Nevertheless, the sockprints were preserved and submitted to Dr. Claude Owen Lovejoy, an expert in biological anthropology.
At trial, the State sought to present Dr. Lovejoy as a witness and have him offer an expert opinion with regard to his comparison of the sockprints. Pursuant to Evid.R. 8, a hearing was conducted out of the presence of the jury and the following facts were adduced.
Dr. Lovejoy was given samples of sockprints from 98 individuals. The doctor obtained other sockprints as well as those taken of Downey and defendant. The two prints taken from the victim's home were also submitted to Dr. Lovejoy. Utilizing photographic translucent overlays, Dr. Lovejoy determined that Downey could not have produced the sockprints, but there was a "high probability" that they belonged to defendant. In reaching this conclusion, the doctor considered the dimensions of the footprints taken from the murder scene and noted that there was an unusually large "central hiatus", there was no "toe bar," there was a "distinctly preserved anterior border of *616 the metatarsal print," the four digits were evenly positioned, and there were "convex medial and lateral borders and possibly a high arch." According to Dr. Lovejoy, the physical characteristics common to defendant's footprint and those found at the scene of the murder disclosed a high probability that they were made by the same person.
In making these determinations, Dr. Lovejoy explained that every foot is anatomically unique in bone structure. He asserted that due to the rigidity of the foot skeleton and the relatively small amount of surrounding tissue, reliable morphological footprint comparisons can be made. The extent to which the print is distorted by socks depends upon the circumstances. According to Dr. Lovejoy, where, as here, the material surrounding the foot is apparently thin, valid comparisons are possible. Dr. Lovejoy noted that the outer garment generally distorts the positioning of the digits, but does not affect the rigid and less mobile characteristics of the foot.
The doctor admitted that morphological footprint comparison techniques are not as reliable as fingerprint and footprint identification by examination and comparison of dermatological ridges. Unlike the latter identification method, there is presently no formal classification system for morphological footprint comparison. Further, Dr. Lovejoy was unable to say whether morphological footprint comparison techniques have been accepted in the scientific community. He made no reference to any recognized statistical analysis of the physical characteristics of the population at large. Moreover, the sample employed by the witness in making his comparisons was not compiled in a manner designed to insure an appropriate reflection of the physical characteristics of the general population.
Based upon this evidence, the trial judge determined that Dr. Lovejoy was properly qualified and that he could express his opinion regarding his comparison of the sockprints. Defendant challenges that evidentiary decision on two bases. She first contends that Dr. Lovejoy was not qualified as an expert. She *617 next claims that the State failed to establish the reliability of the techniques employed.
We are entirely satisfied that Dr. Lovejoy was properly qualified as an expert in the field of biological anthropology with a specialty in human locomotion. Our careful review of the record convinces us that the trial judge's conclusion in that regard was grounded upon substantial evidence. We perceive no valid basis to disturb his discretionary decision. Rempfer v. Deerfield Packing Corp., 4 N.J. 135, 141 (1950); Spiegle v. Seaman, 160 N.J. Super. 471, 478 (App.Div. 1978); State v. Griffin, 120 N.J. Super. 13, 20 (App.Div. 1972), certif. den. 62 N.J. 73 (1972).
We harbor no reservations concerning the witness' opinion that the footprints could not have been made by Downey. The State's evidence clearly established that the techniques employed by the witness were sufficiently reliable to permit an expert opinion excluding Downey on the basis of the prints taken at the scene as compared with the samples submitted. However, we question whether the State presented sufficient evidence relating to the scientific reliability of the techniques employed to enable Dr. Lovejoy to reach the conclusion that there was a "high probability" the footprints left in the bedroom and bathroom were those of defendant.
Although courts and commentators have divided over the issue of the foundational requirements for the admission of expert testimony regarding novel scientific techniques, see Giannelli, "The Admissibility of Novel Scientific Evidence: Frye v. United States, a Half Century Later," 80 Colum.L.Rev. 1197, 1249-1250 (1980), we have adopted the standard that the "mode of analysis used ... must have a sufficient scientific basis to produce uniform and reasonably reliable results...." State v. Kelly, 97 N.J. 178, 210 (1984). See also Romano v. Kimmelman, 96 N.J. 66, 80 (1984); State v. Cavallo, 88 N.J. 508, 516 (1982); State v. Hurd, 86 N.J. 525, 536 (1981). While this threshold test is generally satisfied by a demonstration *618 that the technique has gained sufficient basis for general acceptance within the scientific community, Romano v. Kimmelman, supra, 96 N.J. at 80, recent decisions have suggested that this is not the only permissible means of establishing reliability. State v. Cavallo, supra, 88 N.J. at 521; Windmere, Inc. v. International Ins. Co., 208 N.J. Super. 697, 709 (App. Div. 1986). Authoritative scientific and legal writings as well as judicial opinions indicating that the expert's premises have gained general acceptance are other means commonly used to establish reliability. State v. Kelly, supra, 97 N.J. at 210.
With this in mind, we note that morphological footprint comparison and identification techniques are in their infancy. The admissibility of expert testimony regarding that subject presents a novel question in New Jersey. In a variety of contexts, the courts of other states have considered the issue and have upheld the admission of such evidence. United States v. Ferri, 778 F.2d 985, 988-990 (3 Cir.1985), cert. den. ___ U.S. ___, 106 S.Ct. 2896, 90 L.Ed.2d 983 (1986); State v. Bullard, 312 N.C. 129, 135-54, 322 S.E.2d 370, 374-384 (Sup.Ct. 1984); State v. Maccia, 311 N.C. 222, 225, 316 S.E.2d 241, 243 (Sup.Ct. 1984). We observe that all of these decisions were rendered after defendant's trial. While we express no opinion respecting the merits of the question, we note that this is a rapidly developing field. Should the State seek to introduce such evidence at the retrial, we suggest that the more recent studies referred to in these opinions should be fully explored and an adequate record made. Cf. State v. Cary, 56 N.J. 16 (1970).

III
Defendant's remaining arguments are clearly without merit and do not require extended discussion. R. 2:11-3(e)(2). We are entirely satisfied that the color photographs and slides of the crime scene were properly admitted. State v. Lamb, 71 N.J. 545, 551 (1976); State v. Thompson, 59 N.J. 396, 420-421 *619 (1971); State v. Conklin, 54 N.J. 540, 545 (1969). We are also convinced that Downey's letter in which she professed her love for defendant was admissible to show the close relationship between the two and their possible motive to kill the decedent. In re Spiegelglass, 48 N.J. Super. 265 (App.Div. 1958), certif. den. 26 N.J. 302 (1958). We further find that the knife and sheath found in defendant's home were properly received in evidence. State v. Downey, supra, 206 N.J. Super. at 397. See also State v. Holland, 59 N.J. 451, 457 (1971); State v. Sinnott, 24 N.J. 408, 415 (1957). We have carefully reviewed the record and conclude that defendant's statements were properly admitted. It is abundantly clear that she was free to leave the police station when they were made. We note in that regard that even after defendant was apprised of her constitutional rights she was permitted to leave the station and return to her home. In short, her statements were not the product of custodial interrogation. State v. Marks, 201 N.J. Super. 514, 527-528 (App.Div. 1985). We are satisfied that the prosecutor's remarks in his summation did not exceed the bounds of fair comment. State v. Farrell, 61 N.J. 99, 102 (1972). We reject defendant's contention that she was deprived of her Sixth Amendment right to counsel merely because her attorney decided not to exercise peremptory challenges with respect to jurors who had read general newspaper accounts of the Downey trial. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Finally, the verdict was not against the weight of the evidence. R..3:20-1.

IV
For the reasons stated previously, we are constrained to reverse defendant's conviction for murder. Defendant's conviction for hindering the prosecution of Downey is also tainted and must be reversed. That conviction was predicated upon the allegation that defendant provided Downey with transportation from the scene of the crime and "suppress[ed] or conceal[ed]" the murder weapon. N.J.S.A. 2C:29-3 requires as *620 an element that the actor "have notice, as distinguished from personal knowledge, that a crime has been committed." State v. Lynch, 79 N.J. 327, 338 (1979). Here, the decedent's letter bore directly upon the question of whether defendant actively participated in the crime and hence had notice of Downey's role in its commission. Since we have held that this evidence should not have been admitted, defendant's conviction for hindering the prosecution of Downey must be reversed.
In contrast, we discern no justifiable basis to disturb defendant's conviction for false swearing. At trial, defendant conceded that she had given inconsistent statements under oath. N.J.S.A. 2C:28-2 c. Thus her conviction for false swearing was in no sense affected by the erroneous admission of the decedent's letter.
Accordingly, defendant's convictions for murder and hindering the prosecution of another are reversed. The matter is remanded for a retrial on counts one and two of the indictment. Defendant's conviction on count three for false swearing is affirmed.
NOTES
[1] Morphological footprint comparison involves the analysis of the form and structure of the foot. We use the term here to distinguish this technique from the more common procedure of identification of prints by way of comparison of dermatological ridges.