STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. JOSE MACHADO, DEFENDANT-RESPONDENT.

Argued October 26, 1987—Decided August 17, 1988.

*Arthur S. Safir,* Deputy Attorney General, argued the cause for appellant (*W. Cary Edwards,* Attorney General of New Jersey, attorney).

*John M. Selden* argued the cause for respondent (*Willis & Selden,* attorneys).

PER CURIAM.

The narrow issue on this appeal is whether the trial court committed prejudicial error in admitting hearsay statements made by the deceased victim to various witnesses regarding her fear of defendant. In an unreported decision, the Appellate Division, which ruled that the trial court so erred, reversed defendant's murder conviction and remanded the matter to the Law Division for a new trial. We granted certification, 107 *N.J.* 630 (1987), and now affirm.

I

The Appellate Division summarized the relevant facts:

In relating the facts in this case we primarily describe the tumultuous relationship between defendant and the decedent Nicole DeCombe as defendant was convicted of her murder essentially on the basis of circumstantial evidence relating to this relationship. Nicole and defendant met in May 1982 on Nicole's

first day of work at the Sheraton Heights in Hasbrouck Heights where defendant was working as undercover security and Nicole was employed as a waitress. They quickly became friendly on more than a casual basis and as a consequence defendant seems to have believed that he had a right to control Nicole's actions. Thus in August, when Nicole wanted to attend a convention of a religious group called the Way in Ohio, defendant was adamantly opposed to her going and told her so. Though this dispute precipitated a rather violent argument between them, Nicole nevertheless went to the convention.

When Nicole returned from Ohio, she moved in with defendant. Subsequently they visited her mother and stepfather, Alain DeCombe, to discuss their new living arrangement and to tell them that they wanted to get married. Wedding plans, however, were postponed but Nicole and defendant continued to live together. At first Nicole and defendant were happy though they sometimes argued over her job and style of dress. The record shows that defendant did not like it when Nicole's friends called her or when she went to visit them. Indeed he admitted to people that he was jealous and possessive of Nicole. In fact, he admitted that on a night that they were to have dinner with a Mr. and Mrs. DeRocher, friends of Nicole, he was so displeased with her clothing that an argument ensued and he slapped her to calm her down. Subsequently, in late November or early December at defendant's apartment there was another violent incident between Nicole and defendant.

Toward the end of 1982 Nicole discovered she was pregnant. At first, Nicole and defendant were happy but Nicole soon decided it was not a good time to have a baby as they were not married and a baby would be too much responsibility. Thus Nicole wanted an abortion but defendant was opposed to her having one.

Shortly after Nicole discovered she was pregnant, she called defendant's friends, Krissy and Ramon Liriano, for help so she could leave defendant. Nicole told them that she wanted to leave him because they were not getting along and defendant had been hitting her. Krissy and Ramon made arrangements for Nicole to stay with Krissy in her dormitory at Rutgers University. Following that defendant, who was upset over Nicole's disappearance, looked for her. Eventually defendant and Nicole met and reconciled on Long Island. When they returned from Long Island, Nicole moved back in with defendant but they continued to argue over whether to have the baby. One night just before Christmas Nicole and defendant argued over the baby in the presence of the Lirianos so violently that the police were called. Nicole was then taken to her parents' home in Montclair where she told her stepfather that "he wants to kill me." Nevertheless the next day Nicole called defendant and inquired about what he was doing and told him she missed him. Nicole, however, did not move back with defendant but instead moved to a separate apartment in Jersey City. However, Nicole and defendant continued their relationship until the night of January 27, 1983 when she disappeared.

There is no question but that on the night of January 27 and the morning of January 28, 1983 Nicole and defendant were together. Nicole took defendant to work around 4:00 p.m. and later went to a Way meeting in Weehawken and to Heather's, a disco in the Meadowlands Hilton in Secaucus. Subsequently,

she picked up defendant. Defendant testified he last saw her when he dropped her off near her apartment. According to defendant, he returned to Nicole's apartment the next morning to take her to work. When she did not respond to his knocking on her door he began looking for her. He notified the police of her absence and a few days later filled out a missing person's report.

After Nicole disappeared the police investigated the matter. Jersey City Detective Crowley went to defendant's residence on February 2, 1983 as the result of a report from Nicole's father, Lee Gilbert, that defendant was holding her captive. While Crowley was there, defendant let him look around and they made arrangements for defendant to come to the police station to make a formal statement. A week later, a search warrant was issued authorizing a search of his house and his car. Specifically, the police were looking for blood-soaked clothing, Nicole's clothing and blood stains in the car. Defendant's corduroy pants, blue sweatshirt, work boots and coveralls were all seized and placed in paper bags. Defendant explained to the police officers that these were the clothes he was wearing the last night he had seen Nicole but he did not think the clothes would be useful as they had been washed.

Nicole's body was found on February 26, 1983 when John Taft, his wife and son were riding down Barzooski Street in Kearny, New Jersey, a street on the edge of the meadowlands. Taft stopped the car to see a ringnecked pheasant when he saw the body. At that time a police car came down the street and Taft told the officers what he had found. Subsequently investigating officers saw that Nicole's hands were tied behind her back with makeshift handcuffs. An autopsy showed she died from stab wounds.

After Nicole's body was discovered, several officers from the Jersey City and Kearny police departments visited defendant at his place of employment. He agreed to accompany them to the police station where he was advised of his *Miranda* rights and questioned for approximately two hours. When defendant was told Nicole's body was found in Kearny, he responded that he had no idea where Kearny was and reiterated the account he gave in his earlier statement. The interview ended when a detective allegedly made a comment that defendant would die by lethal injection. At that time defendant asserted his right to an attorney, thus ending the interview. Defendant was not arrested at that time and the investigation continued.

During the investigation defendant's car, coveralls, pants, sweatshirt and work boots were all tested for blood but with negative results. However, the police developed proof that a blue fiber recovered from the rope binding Nicole's hands was the same as fiber taken from a pocket in defendant's coveralls. Further, lint removed from under the handle and sheath of a knife found near the body matched material found in the pocket of defendant's coveralls.

A significant document recovered during the investigation was an undated, handwritten letter from Nicole to defendant which her mother and stepfather found among her possessions when they cleaned out her apartment following her funeral. The letter read:

Dear Jose,

I know you don't understand. Maybe you never will. I don't know. You think there was nothing wrong with our relationship. Well, I can't make you see what I see or make you feel what I feel. I left because I felt my life was in danger. You, of course, would try to convince me it wasn't. You would go as far as to put me under lock and key and leave me no phone, and you would find a way to justify it if it suited your purpose. When I'm scared, I leave, and that's what I did.

Please don't look for me. I'm not in any of the places you've been looking or any place you can imagine or be able to find a number to. I'm safe and far away.

Jose, you have a lot of energy. Put it to good use. You know right from wrong. Please help yourself. You've got to learn to handle Jose before you can handle me.

My prayers are with you.

God bless, Nikki.

### Below the signature, it continued,

Remember, it was not money that made the times. It was us.

I left the necklace and bracelet for you, for I wanted you to know that your money isn't what bought my love. It was your caring and loving actions that made me want to stay with you. Money's no good. It ruins people. I'm glad we didn't have money. We got to share a lot of good times.

After the body was found the investigation continued for about 11 months before defendant was arrested.

## II

In holding that the trial court committed prejudicial error in admitting certain hearsay statements of the victim, the Appellate Division reasoned:

Defendant's first contention relates to the fact that the trial judge admitted under the state of mind exception to the hearsay rule, *Evid.R.* 63(12), testimony from numerous witnesses of statements made by Nicole portraying defendant as a jealous, possessive and easily angered, violent person. Witness after witness described various conversations with Nicole in which she related tales of abuse and beatings by defendant and how she feared him.

We do not find it necessary to set forth all these statements but we will summarize them. Geraldine DeRocher testified that Nicole said she and defendant did not show up for a dinner because defendant hit her, bruising her eye. DeRocher said that she expressed her fear of defendant other times. Danielle Freda testified that Nicole told her she was frightened of defendant because he was very possessive and very jealous. This culminated, Danielle explained, when Nicole told her defendant gave her a black eye and banged her head into the wall. In January, Danielle said Nicole told her that she was still frightened for her life.

Kathy Purdy also told of the conversations she had with Nicole about defendant in which Nicole said he banged her head against the wall and restrained her from leaving the apartment. Purdy said that Nicole was very upset and did not know which way to turn. Lois Boekenstein testified that Nicole had bruises on her face which she received when defendant started throwing her around and beating on her. Krissy Liriano testified that Nicole said defendant hit her head against the dresser and the wall, laid her down on the bed and told her if she moved, he would hit her which he did. Nicole's stepfather testified that when Nicole went home in December she said that defendant wanted to kill her. Further, he was allowed to read Nicole's unmailed letter to the jury.

In our view the evidence of Nicole's state of mind as evidenced by her letter and her statements regarding her fear of defendant was inadmissible. After the trial in this case we decided *State v. Downey*, 206 *N.J.Super.* 382 (App.Div. 1986).[1] *See also State v. Prudden*, 212 *N.J.Super.* 608 (App.Div.1986). As noted in *Downey*, "the great weight of authority clearly precludes admission of a victim's expression of concern that another might have reason to harm him." 206 *N.J.Super.* at 352. It is perfectly clear that the evidence admitted was of the precise nature excluded by *Downey*. While there are exceptions in *Downey* relating to establishing that the decedent was not the aggressor, did not commit suicide and was not accidentally killed, none are germane here. 206 *N.J.Super.* at 392–393.

---

[1]In *Downey*, the Appellate Division found that the state-of-mind exception contains as a predicate to admission that the statement must reflect a mental condition of the declarant that constitutes a genuine issue in the case or that the statement must be otherwise relevant to explain the declarant's conduct. 206 *N.J.Super.* at 390.

The State's theory in *Downey*, as here, was that the hostile relationship between the victim and the defendant supplied the defendant's motive for killing the victim. The trial court admitted an undated, signed letter by the victim that stated:

To Anyone, If anything happens to me or my kids, you can go get, number one, Diane Downey, number two, Linda Prudden, number three, Ray Prudden. * * * They would be the cause of it. [Signed Robert R. Downey.] P.S. In the event of this letter opened, I want my kids to have everything I have. [*Id.* at 388.]

The Appellate Division ruled that admission of this letter under *Rule* 63(12) was improper because the defendant's, not the victim's, state of mind was the material issue. *Id.* at 391. In reaching that result, the Appellate Division noted three well-defined exceptions in which statements of the victim's state of mind are admissible. The three exceptions are where the defendant claims that he or she acted in self-defense, *id.* at 392; that the victim committed suicide, *ibid.;* or that the victim's death was accidental, *id.* at 393.

We recognize that the trial judge attempted to give a careful instruction to the jury regarding the testimony we have mentioned. He said it was admissible as evidence of Nicole's and defendant's state of mind. The difficulty with this is that Nicole's state of mind was not an issue in the case and the evidence did not establish defendant's state of mind.

In his decision to admit the hearsay statements under *Evid.R.* 63(12), the trial judge relied on the statement by the Supreme Court in *State v. Baldwin*, 47 *N.J.* 379 (1966), *cert.* den. 385 *U.S.* 980 [87 *S.Ct.* 527, 17 *L.Ed.*2d 442] (1966), that:

> Declarations by the victim of the crime, or by the accused prior to the criminal event, are admitted notwithstanding their 'hearsay' character. Generally the basis for accepting such testimony is that the behavior of both the victim and the defendant are part of the mosaic of the criminal event, and hence, insofar as their declarations bear upon either the quality of their acts or a relevant state of mind, they must be accepted as part and parcel of the critical scene. [47 *N.J.* at 394]

But *Baldwin* is clearly distinguishable as that case did not involve the issue before us. *Baldwin* was not concerned with a situation in which the court was dealing with a decedent's statement to show her fear of the defendant.[2] Further, we do not regard the victim's statement of fear as part of the "mosaic" of a particular act. Further, the testimony describing Nicole's statement of mind before the murder was hardly part of the criminal scene.

With the following exceptions, we agree substantially with the Appellate Division's decision.

The only point in the State's petition for certification is that the victim's state of mind was in issue and, therefore, that the victim's oral and written hearsay statements were admissible on the State's main case under the state-of-mind exception to the hearsay rule, *Evid.R.* 63(12).[3] For both factual and legal reasons, we disagree.

---

[2]*Baldwin* involved a state-of-mind declaration made by the defendant subsequent to discovery of the victim's body. Although such statements are generally inadmissible, we found the declaration admissible to show that the defendant had an innocent state of mind after the death but before the body was found. 47 *N.J.* at 397. Alternatively, we noted that the admission of the testimony was harmless error in light of other evidence. *Ibid. Baldwin* did not broaden any exception to the hearsay rule for statements made by a victim.

[3]*Evidence Rule* 63(12) provides in pertinent part:

> A statement is admissible if it was made in good faith and it (a) described the declarant's then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental

As to the facts, the State argues that the victim's state of mind was relevant because the defendant placed his relationship with the victim in issue by claiming that the relationship was a good one. The challenged statements, however, were offered by the State and admitted into evidence through various witnesses on the State's direct case. Of necessity, this occurred before the defendant offered any evidence about his relationship with the victim. Hence, the State is simply wrong in trying to justify the admission of the hearsay statements for the asserted reason that the defendant placed that relationship in issue.

On the law, the State contends that *Downey* and *Prudden*, on which the Appellate Division relied, were wrongly decided, and that hearsay statements made by the deceased victim that reflect the victim's state of mind are admissible to establish defendant's motive and intent. *Downey* and *Prudden* held that hearsay declarations of a crime victim's fear of a defendant are not admissible for the purpose of inferring the state of mind of the defendant from those declarations. *Id.* 206 *N.J.Super.* at 390–91.

As the Appellate Division pointed out, *State v. Baldwin* is not to the contrary. In *Baldwin* we declared that hearsay statements made by the defendant were admissible to establish the defendant's state of mind. 47 *N.J.* at 397. That pronouncement is distinguishable from the holding in *Downey* that a victim's statements are not admissible to establish the defendant's state of mind. *State v. Thornton*, 38 *N.J.* 380 (1962), *cert. denied*, 374 *U.S.* 816, 83 *S.Ct.* 1710, 10 *L.Ed.*2d 1039 (1963), is likewise inapposite. In *Thornton*, the defendant placed the conduct of the victim in issue through his claim of self-defense. There we found admissible testimony by a witness that the

feeling, pain and bodily health, but not including memory or belief, to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant. * * *.

victim said she intended to visit defendant not to attack him, but because she thought he was sick.

In fairness to the trial court, *Downey* and *Prudden* were decided after the trial of the within matter, and, therefore, the court did not have the benefit of those opinions when it ruled on the admissibility of the challenged hearsay testimony.

Certain rulings by the trial court are not affected by our opinion. For example, the trial court suggested that some of the decedent's statements to the effect that the defendant physically and verbally abused her could have been admitted under *Evidence Rule* 63(4)[4] as excited utterances. The Appellate Division disagreed, and the State has not sought review of that part of the Appellate Division's ruling. Hence, we do not address it.

Our decision that the decedent's hearsay statements are not admissible under the state-of-mind exception does not preclude the admission of statements made by the defendant on an occasion when the decedent would not ride in the defendant's car. According to Ramon Liriano, who was riding in defendant's car at the time, defendant said, "[t]hat's it. I'm going to kill that bitch." The trial court admitted that statement, citing *Rule* 55, Other Crimes or Civil Wrong; *Evidence Rule* 63(7), Admissions by Parties; and *Evidence Rule* 63(12), Statements of Physical or Mental Condition of Declarant and Related History. The Appellate Division did not discuss the admissibility of that statement, and neither party has raised the issue in this Court.

The trial court also admitted the testimony of Kristine Liriano that approximately five weeks before the decedent's death,

---

[4]*Evidence Rule* 63(4) provides:

A statement is admissible if it was made (a) while the declarant was perceiving an event or condition which the statement narrates, describes or explains, or (b) while the declarant was under the stress of a nervous excitement caused by such perception, in reasonable proximity to the event, and without opportunity to deliberate or fabricate.

defendant became enraged at decedent over her plan to have an abortion. Mrs. Liriano testified that while she and her husband were present in the Machado residence with defendant and the decedent, defendant became enraged when the decedent informed him of her planned abortion. Defendant shouted at and pushed the decedent. The State contends that the defendant's statements were admissible under *Rule* 55 to provide motive for the homicide and to shed light on the relationship between the decedent and the defendant. In admitting the testimony, the trial court stated it was "satisfied that it clearly belongs in the case to establish before the jury the relationship that existed between these two persons some time close to the event at the time she was last seen alive." The Appellate Division did not address that testimony, and we leave in place the trial court's ruling.

Finally, we do not foreclose the possibility that some of the victim's statements may be admissible as background to establish the nature of the relationship between the victim and the defendant. Thus, the statements are indirectly relevant as part of the "mosaic" of the event. *State v. Baldwin, supra,* 47 *N.J.* at 394. To this limited extent, the victim's state of mind reflects her perception of and is relevant to their relationship.

When the victim's declarations do not express fear of the defendant, they might be admissible under an exception to the hearsay rule as a declaration of the victim's state of mind or under some other exception, such as that pertaining to contemporaneous declarations. *See Evid.R.* 63(4). Declarations of the victim's state of mind, however, should not be used to prove the defendant's motivation or conduct.

Furthermore, it may be possible to redact the offensive portions of the victim's unsent letter to the defendant and admit the balance. *Brown v. United States,* 490 *F.*2d 758, 778 (D.C.Cir.1973). This, on the theory that the portions that express fear of defendant are prejudicial, but that the balance may shed some light on their relationship. *Id.* at 766. With

respect to any such evidence, the trial court must balance its probative value against the prejudicial effect of admission.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI, and STEIN–7.

*For reversal*—None.