576 A.2d 828

STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. RONALD
BENEDETTO, JR., DEFENDANT-RESPONDENT.

Argued March 13, 1990—Decided July 18, 1990.

*Virginia M. Lincoln,* Assistant Prosecutor, argued the cause for appellant (*Herbert M. Tate,* Essex County Prosecutor, attorney).

*Robert J. De Groot* argued the cause for respondent.

*Linda A. Rinaldi,* Deputy Attorney General, argued the cause on behalf of *amicus curiae,* Attorney General of New Jersey (*Robert J. Del Tufo,* Attorney General, attorney).

The opinion of the Court was delivered by

GARIBALDI, J.

This appeal presents a narrow question regarding the "state of mind" exception to the hearsay rule, *Evid.R.* 63(12)(a). The issue is whether the trial court committed prejudicial error in admitting certain hearsay statements of the victim recounting threats he had perceived because of an overdue debt that he owed defendant's father. The Appellate Division, which ruled that such statements were expressions of fear excludible under *State v. Machado,* 111 *N.J.* 480, 545 *A.*2d 174 (1988), reversed defendant's murder conviction and remanded the matter for a new trial. We granted certification 117 *N.J.* 73, 563 *A.*2d 835 (1989), and now reverse the Appellate Division.

I

During the early morning hours of October 6, 1986, Anthony Mautone was shot and killed in his garage recording studio in Newark, N.J. An investigation disclosed that Mautone had died at approximately 3:00 a.m. from a single .32 caliber gunshot wound to the back of his head fired at close range. His body had been found lying on the floor in front of his stereo. Shortly thereafter, Ronald Benedetto, Jr. was charged with his murder.[1] The theory of the State's case was that Benedetto lured Mautone to the studio on the pretext of a drug exchange and killed him because of a debt Mautone owed Benedetto's father.

---

[1] In November 1986, Benedetto, then sixteen years old, was charged in a juvenile-delinquency complaint with the first degree murder of Anthony Mautone and with unlawful possession of a weapon. Following a hearing pursuant to *Rule* 5:22–2, the Chancery Division, Family Part, waived jurisdiction and defendant was prosecuted as an adult.

On the previous evening, Sunday, October 5, 1986, Mautone had been working as a disc jockey at Society Hill, a Morristown night club. Ordinarily, Mautone would visit with his girlfriend, Anna Prassinos, at the club and then afterward at her home before returning to Newark. Prassinos testified that shortly after midnight on October 6, Mautone had received a phone call at the club. Mautone had later told Prassinos that the caller had been Benedetto, Jr., asking that Mautone meet him after work to sell him cocaine. After a second telephone call, Mautone had told Prassinos that he could not go to her house that night because he had to meet Benedetto, Jr., at his studio garage in Newark. During their conversation that evening Mautone also told Prassinos that he had borrowed approximately $7,000 from Benedetto's father that he had not yet repaid. Specifically, Prassinos testified as follows:

Q: And what did he tell you about on that evening?

A: It was a debt that he had with Ronnie, Jr.'s father, Ronald Benedetto, Sr.

Q: Did you discuss the amount of that debt and the circumstances under which that debt came into being?

A: Yes, I did.

Q: Would you tell the jury about that conversation that you had with Anthony Mautone?

A: A debt involved Anthony borrowing money previous years before I had met him, the amount of $7,000, to which Anthony used a little over $4,000 to buy drugs with, and the rest was used for debt, to pay other people off debts that he had.

Q: And did you discuss with him whether or not he had paid that debt back to Benedetto, Sr.?

A: Yes, I did discuss that with him, and from the conversation we had the debt was not paid back to Benedetto, Sr. It was not paid back.

Q: Did he tell you whether or not any threats had been made to him regarding that debt?

A: Oh, yes.

Q: And could you tell the jury about that?

A: He had felt threatened because he didn't know what was going on. He had been followed previous to his death two or three weeks before his death, he had been threatened, he had been followed by a white car when he took his girlfriend of many years to the movies one night, and he just wasn't sure, every time he turned around there were certain phone calls and stuff being done that

were strange to him, had no connection actually to things that he was doing, and he knew something was up but he didn't know exactly what it was.

\* \* \* \* \* \* \* \*

Q: Did he tell you specifically on that evening who it was that was threatening him?

A: No, he didn't.

After the last song of the night, played at approximately 1:15 a.m., Mautone had told Prassinos that he was going to his Newark garage-studio to meet Ronald Benedetto, Jr.

At approximately 2:00 a.m. on that fateful evening, Phyliss Rivera, Mautone's neighbor, stood at her window waiting for her daughter to come home. Ms. Rivera testified that at about 2:30 a.m., she saw a person wearing a two-tone denim jacket. That person, whom she could not otherwise identify, had greeted Mautone and entered the studio with him. Around 3:00 a.m. she had heard a loud noise that she later identified as a gunshot. Police subsequently found a jacket fitting that description in Benedetto's bedroom. Laboratory analysis of the jacket revealed a trace amount of lead, such as would be found in gunshot residue, in the right pocket.

Two of defendant's friends, Robert Scruggs and Robert Gregoire, both testified that at a gathering with several other friends at the railroad trestle in Belleville in October 1986, after the murder, Benedetto had told them he had shot someone for his father with a .32 caliber gun in exchange for $2,000 and a Camaro when he turned seventeen. Moreover, Gregoire testified that prior to the murder defendant had shown him that .32 caliber gun, identified as a gift from his father, and had told him of his plan to "cripple or hurt" Mautone because of the debt. Gregoire further testified that at approximately 2:00 a.m. on October 6, 1986, defendant had telephoned him at his home and stated that he had to go out and "do something for his family [ ] to Anthony." About fifty minutes later defendant had again called Gregoire and had described in great detail the murder he had just committed. He stated that he had arranged to meet Mautone at his garage to get some cocaine. When

Mautone arrived, he told defendant that he had to get his cigarettes from his car; defendant had walked to the car with Mautone and pulled out the gun, but defendant had "said his hand froze, he couldn't shoot him." The two men then went inside the garage and sat there talking. At one point, defendant had asked Mautone if he had "any better music." Mautone had said that he did, and when he went to put on a different tape, defendant shot Mautone, at close range, in the back of the head. Defendant had further told Gregoire that he had then left the garage, closing the door behind him, had put the gun in the glove compartment of his car. He "remembered he had his fingerprints on the garage door, [so] he went back, wiped them off, got in the car and took off." Those details were consistent with Rivera's and Prassinos' testimony and with the physical evidence found by police.

In November 1986, Gregoire, wearing a recording device supplied by the investigating police, again discussed the murder with defendant. In the audio recording of their conversation, defendant impliedly admitted guilt by asserting that there was no way the police could prove he had committed the murder unless Gregoire disclosed their conversations. After a Rule 4 hearing the tape was admitted into evidence. At the time of trial, Gregoire had been on probation for juvenile offenses, but testified that he had not been offered prosecutorial assistance for his testimony against Benedetto.

A jury found defendant guilty of knowing and purposeful murder, *N.J.S.A.* 2C:11–3(a)(1) and (2), and two counts of unlawful possession of a weapon, *N.J.S.A.* 2C:39–4(a) and –5(b). The court sentenced defendant to a term of life imprisonment with a thirty year parole disqualifier for the murder, and a concurrent five year term on the weapons charge.

II

■ Simply stated, the "state of mind" exception to the hearsay rule allows admission of extrajudicial statements to

show the state of mind of the declarant when it is at issue in a case. *State v. Baldwin*, 47 *N.J.* 379, 394, 221 *A.*2d 199, *cert. denied*, 385 *U.S.* 980, 87 *S.Ct.* 527, 17 *L.Ed.*2d 442 (1966); *State v. Downey*, 206 *N.J.Super.* 382, 389, 502 *A.*2d 1171 (App.Div. 1986). It also allows such statements to show the declarant's intent to act in the future, when the occurrence of that act is in dispute. *State v. Downey*, 237 *N.J.Super.* 4, 12, 566 *A.*2d 822 (App.Div.1989); *State v. Downey, supra*, 206 *N.J.Super.* at 390, 502 *A.*2d 1171. Presently codified at *Evid.R.* 63(12)(a), the New Jersey Rule provides:

> A statement is admissible if it was made in good faith and it (a) described the declarant's then existing state of mind, emotion or physical sensation, including statements of intent, plan, motive, design, mental feeling, pain and bodily health, but not including memory or belief, to prove the fact remembered or believed, when such a mental or physical condition is in issue or is relevant to prove or explain acts or conduct of the declarant.  * * *

In *State v. Downey, supra*, 206 *N.J.Super.* 382, 502 *A.*2d 1171, the Appellate Division considered whether a victim's declaration expressing fear of the defendant was admissible under *Evid.R.* 63(12)(a). The State's theory in *Downey* was that the defendant wife had killed her husband because he suspected that she was engaged in a lesbian relationship. The trial court had admitted into evidence an undated handwritten letter of the victim's:

> To Anyone, If anything happens to me or my kids, you can go get, number one, Diane Downey, number two, Linda Prudden, number three, Ray Prudden [Linda Prudden's husband]. They are at 218 Hardy Avenue, Bound Brook, New Jersey, 356–8574. They would be the cause of it. [Signed Robert R. Downey] P.S. In the event of this letter opened, I want my kids to have everything I have.
>
> [206 *N.J.Super.* at 388, 502 *A.*2d 1171].

The court first explained that the victim's expression of fear did not satisfy either of the two evidentiary requisites contained in *Evid.R.* 63(12)(a). First, it observed that the victim's state of mind had not been at issue, and further that the victim's hearsay statements had not been admissible to imply the state of mind of the defendant. *State v. Downey, supra*, 206 *N.J.Super.* at 391, 502 *A.*2d 1171. Second, the court explained that

the letter had not explained the victim's subsequent conduct. *Ibid.* Noting that "the great weight of authority clearly precludes admission of a victim's expression of concern that another might have reason to harm him," *id.* at 392, 502 *A.*2d 1171, the Appellate Division observed the three well-defined circumstances in which victims' statements of fear are generally admissible: when the defendant claims he or she acted in self-defense, when the victim committed suicide, or when the victim's death was accidental. *Id.* at 392–93, 502 *A.*2d 1171. Finding that the decedent's letter did not fall within one of those exceptions, *id.* at 393, 502 *A.*2d 1171, and that its admission was prejudicial because of its "compelling nature [ ] coupled with prosecutor's repeated and graphic references to it in his summation," the Appellate Division ruled that the trial court had committed reversible error in admitting the hearsay statement. *Id.* at 394–95, 502 *A.*2d 1171. *See also State v. Prudden,* 212 *N.J.Super.* 608, 515 *A.*2d 1260 (App.Div.1986) (in trial of *Downey*'s co-defendant, admission of husband's letter also was reversible error, despite court's limiting instruction and absence of reference to letter in prosecutor's summation).

Recently, in *State v. Machado, supra,* we affirmed the reasoning of *Downey* and *Prudden* to the extent that those decisions held that a victim's extrajudicial statements of fear reflecting on the defendant's state of mind are not admissible under *Evidence Rule* 63(12). In *Machado* the trial court had admitted testimony from numerous witnesses relating their conversations with the victim about her personal relationship with the defendant, including statements that she was frightened of him. The trial court had also admitted an unmailed handwritten letter from the victim to the defendant, which stated: "I left because I felt my life was in danger." *Id.* 111 *N.J.* at 484, 545 *A.*2d 174. The trial court had admitted the hearsay statement as part of the "mosaic of the criminal events," recognized in *State v. Baldwin, supra:*

Declarations by the victim of the crime, or by the accused prior to the criminal event, are admitted notwithstanding their 'hearsay' character. Generally the

basis for accepting such testimony is that the behavior of both the victim and the defendant are part of the mosaic of the criminal event, and hence, insofar as their declarations bear upon either the quality of their acts or a relevant state of mind, they must be accepted as part and parcel of the critical scene. [47 *N.J.* at 394, 221 *A.*2d 199].

We found that evidence of the victim's state of mind, as presented through her letter and her statements regarding her fear of defendant, had been improperly admitted under *Evidence Rule* 63(12)(a). We first observed that the victim's statements had not been admissible under *State v. Baldwin,* *supra,* because there, unlike this case, the declarant's state of mind had been in issue. 111 *N.J.* at 487, 545 *A.*2d 174. Moreover, relying on *Downey* and *Prudden,* we stated that the victim's statements of fear had been improperly admitted insofar as they had reflected on the state of mind of the defendant. *Ibid.* We added, however, that

we do not foreclose the possibility that some of the victim's statement may be admissible as background to establish the nature of the relationship between the victim and the defendant. Thus, the statements are indirectly relevant as part of the "mosaic" of the event. *State v. Baldwin, supra,* 47 *N.J.* at 394 [221 *A.*2d 199]. To this limited extent, the victim's state of mind reflects her perception of and is relevant to their relationship.

[*Id.* 111 *N.J.* at 489, 545 *A.*2d 174].

With that as background, we consider the hearsay testimony of Anna Prassinos.

### III

Preliminarily, we observe that our review is limited to an extremely small part of Anna Prassinos' hearsay testimony. The Appellate Division found that Prassinos had been "properly allowed to testify that Mautone told her he was going to the studio to meet Benedetto." We agree that Mautone's statements to Prassinos informing her of Benedetto's phone call and his intention to meet Benedetto at his garage studio described Mautone's state of mind and were relevant to explain his subsequent conduct. *Evid.R.* 63(12)(a). Likewise, we find that Mautone's statement regarding his outstanding debt to Benedetto's father was also admissible to prove his subsequent

conduct. That statement explained why he felt obligated to meet Benedetto that night despite other, pre-existing plans. Hence, we consider only whether the trial court improperly admitted Mautone's account of previous threats under *Evidence Rule* 63(12)(a), and if so, whether that admission was prejudicial error.

Second, we observe that the disputed evidence is easily distinguishable from the written statements excluded in *Downey* and *Machado*. In both *Downey* and *Machado* the victims' undated written statements had expressed fear that they were in danger from specific defendants. In those cases the victim's fear had been unmistakable and had specifically pointed at the defendants. Mautone's statements, on the other hand, consisted only of vague "threats" from unspecified persons. The words "fear" and "afraid" do not appear in Anna Prassinos' testimony. There is no indication in her testimony that Mautone had been nervous or apprehensive about meeting defendant in Newark late that night. Indeed, a jury could infer from Mautone's willingness to meet Benedetto and his failure to have taken any safety precautions that he had had no fear of defendant harming him.

Moreover, the written statements of the victims in *Downey* and *Machado* had been undated and had not been specifically related in time to the murders. Here, the victim's statements had been made on the night of the murder possibly as part of his explanation to his girlfriend of why he was varying from his normal routine. In that regard, the State argues that Mautone's statements were not expressions of fear, and therefore had been admissible under *State v. Baldwin, supra*, as part of the "mosaic of the criminal event." 47 *N.J.* at 394, 221 *A.*2d 199.

This case, therefore, presents a close question as to whether Anna Prassinos' testimony should have been excluded as an expression of Mautone's fear. While Mautone's statements standing alone may not unequivocally have represented expres-

sions of fear, in summation the state had connected Mautone's sense of fear to the debts: "You know that he [Mautone] was fearful because he had been threatened regarding that money." We are satisfied, viewed in the context of the State's case, that Mautone's statement to Prassinos recounting threats were expressions of fear. Although those statements were not of the same magnitude as those recognized in *Downey* and *Machado*, they nonetheless had implied a sense of fear that Mautone was subject to some possible harm arising from the nonpayment of his debt.

██ Expressions of fear may be admissible when the victim's state of mind is a relevant issue. Mautone's statements, however, do not fall within that category. Benedetto had not claimed that he acted in self-defense, he had not alleged that Mautone had committed suicide, nor had he claimed that Mautone's death was accidental. *See State v. Downey, supra,* 206 *N.J.Super.* at 392–93, 502 *A.*2d 1171; *State v. Machado, supra,* 111 *N.J.* at 485 n. 1, 545 *A.*2d 174. Moreover, no other relevant issues had been presented regarding the victim's state of mind prior to the murder. As in *Downey* and *Machado*, the state of mind of defendant, not of the victim, was the principal issue in this case.

The State argues that Mautone's testimony of past threats, like his testimony regarding Benedetto's phone calls and the existence of the debt, was relevant to prove his conduct after leaving the club on the night of his death, thus satisfying the second evidentiary requisite. Specifically, *amicus* argues that Mautone met defendant to "fulfill his sense of obligation created by the unpaid debts." That explanation, however, establishes only that the unpaid debt had induced Mautone to meet Benedetto that night. Indeed, it is plausible that a person who owes an unpaid debt would feel a sense of obligation to meet and to help his lender's son. It does not similarly follow, however, that threats of harm—admittedly vague and unspecified—would also induce the borrower to act in that same way.

Hence, the threats, even when linked to the debt, do not further explain Mautone's conduct on the night of his murder.

■ Accordingly, we find that Mautone's statements describing threats are most appropriately characterized in the context of this case as expressions of fear, not relevant to any issue and not explanatory of how defendant had acted on the night of his death. As such, their probative value, if any, is minimal, and is clearly outweighed by the potential prejudice associated with jury misuse of the evidence. See *Evidence Rule* 4; *State v. Prudden, supra,* 212 *N.J.Super.* at 614, 515 *A.*2d 1260. Hence, we hold that Prassinos' testimony recounting threats perceived by Mautone were improperly admitted under *Evid.R.* 63(12)(a).

IV

■ We must therefore consider whether admission of that segment of Prassinos' testimony constituted harmless error. See *R.* 2:10–2. We have stated that "the question whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict." *State v. Macon,* 57 *N.J.* 325, 335, 273 *A.*2d 1 (1971). That possibility must be "one sufficient to raise a reasonable doubt as to whether the error led the jury to the result it otherwise might not have reached." *Id.* at 336, 273 *A.*2d 1.

Weighed against that standard, we are convinced that any error in the eight-day trial in admitting that small segment of Anna Prassinos' testimony was harmless. The majority of Prassinos' testimony—which the trial court properly admitted—placed Benedetto and Mautone at the Newark studio on the night of the murder. She testified that Mautone had received a phone call from Benedetto that night and had planned to meet him in Newark later that evening to sell him cocaine. Phyliss Rivera testified that at about 2:00 a.m., a time consistent with Prassinos' estimation of Mautone's meeting, she had seen a man wearing a two-tone denim jacket meet Mautone and enter

his studio. Soon thereafter, she had heard a noise, which she later identified as gunshot. When the police searched defendant's apartment they found a two-tone denim jacket containing trace amounts of lead in its pocket, consistent with that of a gun. An autopsy revealed that Mautone had died at approximately 3:00 a.m. from a gunshot wound to his head.

The linchpin of the State's case was the testimony of Robert Gregoire, who testified that he had seen Benedetto with a .32 caliber gun he had received from his father. Gregoire also testified that Benedetto had told him that his father had offered him a car and $2,000 in exchange for hurting Mautone. On the night of the murder, Benedetto had called Gregoire, admitting he had shot the victim in the back of the head, and related specifically how the murder had occurred. Gregoire's testimony of defendant's account of the murder had been consistent with the testimony of the other witnesses and with the physical evidence. Finally, in the recorded conversation, defendant had strongly implied that he had murdered Mautone. Moreover, Robert Scruggs, another friend of Benedetto, testified that several days after the murder, Benedetto had stated that he had shot someone in the head.

Against this background, any error in admitting the objectionable testimony must be considered harmless. *R.* 2:10–2. In our view, there was overwhelming evidence of guilt without that limited portion of Anna Prassinos' hearsay testimony, and there is no reasonable "possibility that it led to an unjust verdict." *State v. Macon, supra,* 57 *N.J.* at 335, 273 *A.*2d 1.

The judgment of the Appellate Division is reversed.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed*—None.