# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."  Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited.  R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-5809-17

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

KEVIN MONTONE, a/k/a
KEVIN C. MONTONE,
KEVIN CONNAHANMONTONE, and
KEVIN B. CONNAHAN-MONTONE,

     Defendant-Appellant.

_____

Argued March 17, 2021 – Decided January 3, 2022

Before Judges Fuentes, Whipple, and Rose.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 15-02-0126.

Alan L. Zegas argued the cause for appellant (Law Offices of Alan L. Zegas, attorneys; Alan L. Zegas and Joshua M. Nahum, on the briefs).

Erin M. Campbell, Assistant Prosecutor, argued the cause for respondent (Esther Suarez, Hudson County Prosecutor, attorney; Erin M. Campbell, of counsel and on the brief).

The opinion of the court was delivered by

FUENTES, P.J.A.D.

Defendant Kevin Montone was tried before a jury and convicted of first degree murder by purposely or knowingly causing the death of his wife Monica Montone, N.J.S.A. 2C:ll-3(a)(1), (2), second degree endangering the welfare of his infant son, N.J.S.A. 2C:24-4(a)(2), and third degree possession of heroin, N.J.S.A. 2C:35-l0(a)(1). The trial judge sentenced defendant on the conviction for first degree murder to a thirty-year term of imprisonment, with an eighty-five percent period of parole ineligibility and five years of parole supervision pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge imposed a consecutive term of ten years on the conviction for second degree endangering the welfare of his infant son, and a concurrent term of five years on the conviction for third degree possession of heroin.

In this appeal, defendant argues the trial judge committed reversible error when he: (1) allowed the State's witnesses to describe defendant as a physically abusive husband based entirely on highly prejudicial hearsay testimony; (2) admitted into evidence over fifty graphic photographs depicting the crime scene and the victim's corpse during various phases of the autopsy examination; (3) allowed investigators from the Division of Child Protection and Permanency

(DCPP) to provide hearsay testimony of alleged words uttered by defendant's two-year-old son; (4) denied defendant's application to strike parts of the testimony of the State's toxicology expert; and (5) included as part of the jury instructions the "false in one, false in all" charge, over defense counsel's objection.

In her opening statement to the jury, the prosecutor characterized defendant's 911 call seeking medical assistance for his wife, whom he had found unresponsive on the floor of their home, as a ruse to cover the fact he had previously strangled her to death. In his opening remarks to the jury, defense counsel claimed the decedent's demise was caused by a self-induced drug overdose. Thus, as framed by the attorneys, the outcome of this case turned on which of these two incompatible accounts of the victim's demise was supported by competent evidence.

After reviewing the record developed before the trial court, we reverse. The trial court misapplied the Supreme Court's holding in State v. Scharf, 225 N.J. 547 (2016), when it admitted into evidence hearsay statements attributable to the victim under the state of mind exception in N.J.R.E. 803(c)(3). The court also erred when it admitted into evidence the hearsay testimony of two DCPP caseworkers who related words allegedly uttered by defendant's two-year-old

son.  Finally, the court erred when it admitted into evidence over fifty photographs depicting graphic images of the crime scene, including numerous images of decedent's body during the autopsy examination.  The cumulative prejudicial effect of this inadmissible evidence far exceeds its ostensible probative value under N.J.R.E. 403.

## I.

## A.

### First Response

The State's first witness was a Hudson County Sheriff's Officer who authenticated a flash drive containing an audio recording of the 911 telephone call defendant made on the afternoon of August 18, 2014.  In the part of the recording played to the jury, defendant tells the 911 operator to send an "ambulance ASAP."  The 911 operator immediately transferred the call to the ambulance unit, where an individual asked defendant to describe "exactly what happened."  Defendant stated:  "I don't know, I woke up this morning and my wife was unresponsive.  She feels like she's alive[,] but I don't know what's going on with her.  She's not breathing."

The dispatcher assured defendant an ambulance was on its way and asked him for his wife's name and age, and whether she was awake and breathing.

After he provided the personal information requested, defendant answered "no" to the last two questions. Defendant then asked the dispatcher: "Can you just get here, man, please?" The dispatcher explained he was not part of the response team, asked defendant to remain on the phone, and assured him the paramedics were on their way. The dispatcher then directed defendant to put his wife "flat on her back." When defendant stated she was already on her back, the dispatcher insisted: "On the floor. Sir, we still need to do it, okay? Lay her flat on her back on the floor and remove any pillows." Defendant complied.

Sean Boyle was the first emergency medical technician (EMT) who responded to defendant's 911 call. He described himself as "a career fire fighter with the City of Bayonne" who also maintained "employment on the side as an emergency medical technician." At the time, he was employed by the Jersey City Medical Center (JCMC) as a field supervisor "overseeing a tour [of] approximately between twelve and fourteen ambulances." According to Boyle, an EMT's responsibilities involve basic first aid, stabilization of injuries, and caring for the critically ill and injured.

Because he was closer to defendant's residence than the ambulance sent in response to defendant's 911 call, Boyle notified the dispatcher he was going over to "find out what was going on and give them a general report." Boyle

arrived at defendant's residence at 1:42 p.m. He grabbed his "jump bag and a [defibrillator]" and walked towards the one and a half story structure. Defendant opened the door to Boyle. As soon as he entered, Boyle saw a little boy, who appeared to be between two and three years old, sitting on the couch.

Boyle testified he also saw a woman lying on the floor approximately ten feet from the front door and "immediately adjacent to a couch." Defendant told Boyle the woman was his wife. Boyle "could see her clearly from the doorway." He testified the woman was cold to the touch, did not have a pulse, and appeared "to be in rigor." In response to the prosecutor's question, Boyle described the residence as "messy" with "empty fast[-]food containers scattered about." He described defendant's demeanor as "just shuffling around the living room [while] I assessed his wife."

The ambulance arrived approximately three minutes after Boyle. But, Boyle testified he did not allow the two responding EMTs to go inside the residence because he thought "we were dealing with a potential crime scene." On cross-examination, Boyle testified defendant was crying and repeatedly asked him to help his wife. He also admitted he did not speak to defendant before the ambulance arrived.

Patricia Paredes was one of the two ambulance unit EMTs who responded to defendant's 911 call. Her testimony is at odds with Boyle's account of events. Paredes characterized the nature of the 911 call as a cardiac arrest. She testified she and her partner, Paul Vega, arrived at defendant's residence before Boyle. Furthermore, when she and Vega arrived, defendant and his son were the only ones inside the residence. Finally, she did not recall when Boyle arrived.

Paredes testified she entered the apartment and saw "a female laying prone on the floor with a male standing by and a two year, around [two-year-old] child." She described the apartment as "a mess" with "broken wood and stuff all over the floor." Paredes testified she and her partner entered the residence to determine the condition of the woman:

> We checked her to see if she [had] a pulse, there [were] no signs of life. She was already cold. She did have blunt trauma to her face, swelling around the eyes, black and blue. At that point we realized there was something not normal so we just grabbed the child, put him in a safer place at that time.

This prompted an immediate objection from defense counsel, which the trial judge sustained after a brief sidebar conference. According to Paredes, defendant "appeared to be incoherent. He was not connecting with anything, not making sense . . . [and] seemed restless, very confused." Once again, Paredes's testimony was irreconcilable with Boyle's description of defendant's

demeanor. When asked whether defendant said anything to her about his wife, Paredes noted: "The only thing I remember is his asking us to help her and we told him that we couldn't, there's not much we could do for her at the moment." At one point, defendant noted Paredes's negative reaction to decedent's facial bruises. Paredes testified defendant came up close to his wife's face and told Paredes he smacked her "to wake her up."

William Clarritt is a Jersey City firefighter. He was also defendant's next-door neighbor at the time of the incident. Clarritt testified he was in his home when the ambulance arrived. He walked to the house and saw that defendant "was crying. [His] [f]ace . . . looked disheveled." Defendant's wife was on the floor. "She appeared blue in the face. Their son was on the couch with [defendant]." The EMT at the scene asked him to remove defendant and the baby. Clarritt testified he first went to the baby's room and retrieved a pair of pants for the child, "and then took them both out." When asked what condition the baby was in when he entered the apartment, Clarritt responded: "The baby was naked."

Clarritt testified he asked defendant to give him his mother's cellphone number or some other way to contact her. When asked why he contacted defendant's mother, Clarritt stated: "I didn't want the baby to go to the state or

somewhere else. I wanted the baby to stay with family." On cross-examination, Clarritt testified that when he walked into the apartment, defendant "was crying hysterically." He testified the EMT asked him to help. "He . . . pretty much gave me a nod and said can you get them out of here and that's what I did." Clarritt also confirmed defendant was saying, "please help my wife, please help my wife[.]"

Jersey City Police Detective James Benko was part of the law enforcement personnel dispatched to defendant's residence to investigate Ms. Montone's death. After reviewing his written report to refresh his recollection, Benko testified defendant "said that he tried to wake his wife -- he woke up, his wife was still sleeping. He tried to wake her, she felt cold. He called 911 and did [Cardiopulmonary Resuscitation (CPR)]." Benko testified he did not investigate the case after investigators from the homicide unit of the Hudson County Prosecutor's Office (HCPO) arrived at the scene.

B.

DCPP Involvement

Simone Coombs was an "investigative worker" in the intake unit of DCPP. Her responsibilities included responding to "allegations of child abuse and neglect and child welfare assessments." At the time of Ms. Montone's death,

Coombs worked at the DCPP Bayonne office; this office is responsible for cases arising in the southern part of Hudson County. Coombs described her role in this case as "the buddy investigator to the primary worker." She assisted the primary worker in anything she or he needed, such as contacting a supervisor or watching a child for a few minutes.

Defense counsel immediately objected when the prosecutor asked Coombs to describe the allegations DCPP investigated related to this case. At a sidebar conference, defense counsel told the trial judge he was concerned because, based on how the prosecutor framed the question, "I'm not sure exactly what her response will be . . . ." After discussing the matter with the attorneys, the judge sustained defense counsel's objection. Coombs testified she stayed with the child on two separate occasions while the primary investigator spoke to the child's relatives. In the process of interacting with this two-year-old child, Coombs asked him if he had any pets. According to Coombs, he responded that his "mommy died." At this point, the DCPP primary investigator, Shayna Bell, "came over and interjected."

Coombs testified Bell asked the child "what happened to his mommy and he said that his mommy died. He said that mommy and daddy were fighting. Mommy went to sleep and she didn't wake up and he said that daddy was

crying." (Emphasis added). Coombs testified Bell then contacted the prosecutor's office. When asked how she knew what the child told Bell, Coombs responded: "I heard him. This is what he said to us." Coombs testified this occurred "in the hallway of the hospital outside the pediatric unit."[1]

Coombs thereafter drove Bell, the child, and his maternal great-aunt to the prosecutor's office. Bell "spoke with some family members that were at the prosecutor's office and [she] sat in a playroom with [the child]." That was the extent of Coombs's involvement with this case. At this point in the trial, the State had not presented any competent evidence to explain why the child was in the hospital or why the child's maternal great-aunt appeared to have de facto custodial authority over the child.

Shayna Bell testified at the second day of trial. She testified that on August 18, 2014, the DCPP received a referral that the child's mother had died and "her son was with the corpse . . . [and] she had been beaten to death." This testimony prompted an objection by defense counsel; the trial judge sustained the objection and instructed the jury "to disregard the last statement by the witness." In contrast to Coombs's testimony, Bell testified the child was in the

---

[1] We presume the authorities took the child to the JCMC to ensure he was unharmed.

A-5809-17

11

hospital with his paternal great-aunt, Susan Montone. Bell described the child as calm and playful. But while on the phone with the child's paternal grandmother, Bell noticed Coombs was talking to the child. After she ended the brief call, Bell approached as Coombs asked the child if he had any pets. At this point she overheard the child say, "my mommy is dead." This prompted the following exchange:

> Q. And what did you do when you heard [the child] say mommy is dead?
>
> A. We didn't try to engage him at that point to see if he knew why he was at the hospital and he reported that his mother went in one white truck, he went in another white truck. He reported that mommy and daddy were fighting. Daddy hit mommy, mommy didn't wake up. Daddy was crying. He reported that his mom had died and he said [his aunt] came and they went in the -- in the white truck.

Based on the child's calm demeanor, Bell decided no further action by DCPP was warranted. Bell contacted law enforcement, however, because "[i]t was determined that [the child] is . . . possibly able to conduct an interview. . . ." Bell and Coombs took the two-year-old child to be "interviewed" by the Special Victim's Unit about the circumstances of his mother's death.

Bell contacted a member of decedent's family after the child's interview session ended. Based on information provided by these unidentified individuals,

DCPP placed the child in a family member's home later that evening. At this time, defendant had been arrested only in connection with possession of heroin. Bell interviewed defendant "within a week or so" later at the home of a family friend.

Although Bell had spoken with defendant's mother before the interview, he was alone during the interview. Bell testified she "reviewed with him the referral that was called in[,] . . . discussed the placement of [his son, and] the reasons why he was placed and then I asked some questions in regard[] to the investigation." Outside the presence of the jury, the trial judge ruled Bell was not permitted to testify about an alleged prior incident of domestic violence mentioned in her interview report. The court found this comment was based on incompetent hearsay evidence. The parties agreed with the judge's ruling.

When the trial resumed after the lunch recess, the prosecutor asked Bell to describe what defendant told her about his wife's demise.[2]

> He stated that they had been sleeping in the living room.
> He had woken up, the phone rang around two o'clock in
> the afternoon. He had woken up to the phone ringing.
> He did see Monica and . . . his son, laying on the couch.

---

[2] In an order dated November 17, 2017, this court granted the State's motion for leave to appeal and summarily reversed the trial court's interlocutory ruling denying the State's application to admit the testimony of this DCPP caseworker. In this order, however, we did not consider the admissibility of this hearsay evidence.

> He thought they were both sleeping but as he looked closer, he noticed that [the child] was awake and watching television. He stated that as he got closer to them, because they were on the opposite couch, that he saw that Monica was blue.
>
> Q. What did he tell you . . . when he realized that his wife, Monica was dead?
>
> A. He stated that she was blue. He called 911, they asked him to perform -- they gave him instructions on how to perform CPR which he did and he said at that time is when he realized that she was dead.

Bell testified defendant told her his drug abuse began with prescription pain pills when he was approximately twenty-three years old. He was briefly sober after completing a thirty-day inpatient rehabilitation program. He relapsed soon after he returned home, when he discovered his wife was still abusing pain medication. Defendant told Bell both he and his wife "switched" to heroin because it was cheaper. He also "reported that Monica was still using cocaine and the heroin." Defendant told Bell he never used heroin in the presence of his son. In response to Bell's follow up question about the location of the child, defendant stated the child "was in another room or would be sleeping."

Defendant also denied any history of physical violence between him and his wife. He told Bell their arguments never escalated beyond oral disputes. Bell asked defendant about a particular argument they had "over a set of keys."

A-5809-17

14

Defendant told Bell, "Monica had left the home for a little while and then had came [sic] back." He did not remember what caused the argument "because they were under the influence at that time."

Bell also discussed with defendant what the child said at the hospital, that "daddy hit mommy and mommy died." According to Bell, defendant "stated that he believed that his son may have -- kind of gotten what he saw confused." He stated that he "was tapping his wife in the face trying to wake her up and that [his son] may have mistaken that for him hitting Monica in a negative way." Defendant also said he never argued with his wife "in front of [his son] . . . they would either be outside of the home or behind closed doors, like in a separate room."

On cross-examination, Bell testified defendant visited his infant son on a weekly basis in accordance with the protocol established by the DCPP for supervised visitations. She testified the child was happy and playful with his father and defendant was actively and lovingly involved with his infant son. These weekly supervised visits lasted approximately two hours.

C.

Testimony of Catherine Talafous

A-5809-17

Catherine Talafous was the State's first witness. She was twenty-three years old in August 2014 and resided on Sycamore Road, in an area of Jersey City nicknamed "Country Village." She testified that sometime after August 21, 2014, she read in the newspaper "about a woman in Country Village that was found dead and there was a picture of her in the article." She recognized the woman as the same person she "had an incident with a couple months prior." She met with HCPO detectives sometime thereafter.

The prosecutor began Talafous's direct examination as follows:

Q. Now you said that you recognized the picture of the woman in the article?

A. Yes.

Q. Was that woman's name Monica Montone?

A. Yes.

Q. Now you said that you remembered meeting her, that there was an incident prior.

A. Yes.

Q. When was that? When was that incident?

A. It was in June.

Q. Of what year?

A. The same year.

Q. And prior to meeting Monica in June[] 2014, had you seen her or spoken to her before?

A. No.

Q. Can you please describe for the jury what happened when you met Monica?

A. I was coming back to my house. I was working two jobs at the time[,] so this was in the early afternoon. I was on my way to the second job and Monica came up to me with a child and she asked to -- she asked for a lighter so she could smoke a cigarette and then she told me that she had been beat[en] by her husband and asked to borrow my phone. So[,] I let her borrow my phone.

Q. Did Monica tell you where she lived?

A. In Country Village but not -- I didn't know where.[3]

[(Emphasis added).]

The only detail Talafous remembered about this alleged assault was decedent's frustration that her husband beat her with and broke an expensive item like an iPad. When asked if decedent had any visible injuries, Talafous testified she only remembered "[h]er eye was swollen and her shoulder also looked like it had some bruises on it or scratches, something." With respect to the child's condition, Talafous noticed the child was not wearing shoes. She

---

[3] Based on the address she provided at trial, Talafous's residence was located approximately 0.03 miles north of defendant's home on Sycamore Road.

A-5809-17

17

claimed decedent told her "she left the house quickly and they didn't have time to get his shoes because it was in the middle of the incident."

> Q. Do you remember why Monica told you that she left the home in a hurry?
>
> A. She said that her son tried to stop what her husband was doing and that he somehow like moved him or there was some physical contact between the father and the son that she felt was threatening and that she just took him and left.
>
> Q. Now when Monica was telling you that her husband beat her . . . where was her son? Where was her child?
>
> A. With her. She -- they came to the -- they came, we were in front of my house together.
>
> Q. Did she . . . stay in front of your house with her son as she spoke to you?
>
> A. <u>She started getting a little upset which was making her son upset so her son went in the house with my brother and I stayed with her while she was using my phone in front of the house</u>.
>
> [(Emphasis added).]

Talafous testified she overheard the "majority" of decedent's cellphone conversation because "she had it on speaker." Decedent told the person on the phone "she just wanted a divorce and she needed help with a divorce." Talafous testified she told her "to file a police report." The prosecutor followed up on this particular issue:

Q. And what was Monica's response when you told her to file a police report?

A. She didn't want to. She seemed to be under the impression that she wouldn't be believed.

This triggered an immediate objection by defense counsel. At sidebar, defense counsel argued the witness was testifying about "[w]hat she remembers she thinks that Monica said." He believed the witness was merely "guessing and trying to remember but she's not specifically sure what it was." The judge found Talafous's testimony was "fairly accurate." Although Talafous had not mentioned anything about defendant's past association with the Jersey City Police Department as a civilian employee, the judge overruled defense counsel's objection and held:

> She said it was her perception that -- and she's going to say what I think is she didn't go to the police because of the defendant's connection to the Jersey City [P]olice [D]epartment. Consistent with her testimony and she's relating to the jury that it was Monica's perception as to why, which is the reason why the victim's perception are admissible under Scharf . . . .

Immediately following the court's ruling, the prosecutor asked Talafous:

> Q. Ms. Talifous [sic], I was asking you why Monica told you that she did not want to report the incident to the police. What did she tell you?
>
> A. She seemed to be under the impression that it would cause more problems and that she wouldn't be believed.

A-5809-17

19

Q. Did she tell you why she wouldn't be believed?

A. She said that his family had connections.

Q. Did she tell you what those connections were?

A. No.

On cross-examination, Talafous made clear she did not know who decedent was talking to on the cellphone. Although she did not hear "any names," she thought decedent "tried to call her mom first and then I'm pretty sure she was speaking with her brother. I don't think that the first call went through." Talafous also testified decedent and the child were in her house "no longer than . . . twenty to thirty minutes."

At the conclusion of Talafous's testimony, the judge conducted a sua sponte sidebar conference with the attorneys:

> THE COURT: [Addressing defense counsel] Alright, so you're requesting that I give a limiting instruction now?
>
> DEFENSE COUNSEL: Judge, --
>
> THE COURT: I'm supposed to give it now. [Addressing the prosecutor] Do you have a copy of your limiting instruction?
>
> PROSECUTOR: No I don't.

THE COURT: Well I'm going to tell them that the statements that they just heard attributed to the victim were admitted for the purpose to show not the defendant's propensity for any violent act, but rather for the victim's state of mind as to why she acted uncertain -- a certain way on that occasion. Is that it?

In response to the judge's question, defense counsel confirmed the parties had previously agreed to that limiting instruction. When the judge asked what the stated purpose was, the prosecutor responded: "The victim's statements of fear." The prosecutor also noted the court had previously upheld Talafous's testimony under N.J.R.E. 404(b).[4] Based on the prosecutor's statement, the judge excused the jury in order to discuss the matter in open court.

The judge believed these instructions were required, pursuant to the Supreme Court's holding in Scharf, to guide the jury on how to consider Talafous's hearsay testimony. He previously admitted this hearsay testimony based exclusively on decedent's fear of defendant "in the months and weeks leading up to her death." The judge also made clear the jury cannot consider Talafous's testimony as evidence of defendant's actions or intent.

---

[4] The judge had previously ruled that "[d]efendant's prior bad acts: i.e., beating Monica with an iPad, is vital for the jury to understand [d]efendant's motive and intent - and that [d]efendant's conduct was neither an accident, nor a mistake."

21

The prosecutor claimed the court had already decided this issue in a pretrial hearing conducted under N.J.R.E. 104(a). After considering the witness's testimony, the court found this hearsay testimony was admissible under both N.J.R.E. 803(c)(3) and N.J.R.E. 404(b). Considering defense counsel's continuous objections, however, the State assented to rely only on state of mind evidence under N.J.R.E. 803(c)(3). This change in the State's position prompted the following response from defense counsel:

> [J]ust so the record is clear . . . I objected to her testimony and I object to the limiting instruction. I think it misstates the defense here.
>
> . . . .
>
> I'm just saying that for the record my position is that accident refers to a situation where the defendant is claiming[,] for example[,] that they were with somebody and they were accidentally cleaning, you know, their gun and the gun accidentally went off. Or they're at the top of a staircase and the person accidentally fell down the stairs. That's my position.

Defense counsel also objected to the part of the jury instruction that mentioned decedent was in fear of defendant. Counsel argued Talafous did not say decedent told her she was afraid of defendant. The prosecutor argued the jury was entitled to draw a reasonable inference from Talafous's testimony that decedent was afraid of defendant based on the way she fled from her home.

Talafous testified decedent told her that after a physical altercation with defendant, she left her home with her barefooted two-year-old son, and without a cellphone. Talafous also claimed decedent did not want to file a police report because defendant's family "had connections." The court accepted the prosecutor's argument.

The judge gave the jury the following limiting instructions after the trial resumed:

> The [S]tate has introduced evidence of the victim, Monica Montone's state of mind. More specifically, the state introduced evidence from the testimony of Catherine Talafous[,] who we just heard testify regarding Monica Montone's fear of the defendant in the months and weeks leading up to her death.
>
> Normally, such evidence is not permitted under our rules of evidence. Our rules specifically exclude hearsay testimony, however, our rules do permit evidence of a decedent's state of mind when it is used for certain specific purposes and narrow purposes.
>
> In this case, the defendant alleges Monica Montone's death was due to an accidental drug overdose, making Monica's state of mind relevant and her statements of fear admissible.[5]
>
> If you find that Monica Montone made the statements of fear, then you may consider them only for the

---

[5] As we will explain under Section III infra, this instruction misapprehends defense counsel's consistent position that Ms. Montone's death was not accidental, as explained by the Supreme Court in Scharf.

A-5809-17

23

purpose of determining her state of mind at the time those statements were made and for no other reason.

As always, you may give the opinion such weight as you determine it deserves, consistent with the general rules of determining credibility and with the rules and instructions I will give you again at the end of the case.

However, the evidence may not be used as evidence of the defendant's actions or intent.

Testimony of Jose Garcia

The State next called decedent's older brother Jose Garcia. After a few preliminary questions about his family and his employment as a nurse, the prosecutor asked him to describe his sister to the jury. According to Garcia, "she was a born [salesperson]" with the "infuriat[ing]" ability to convince people who strongly held a different opinion to agree with her point of view. Garcia testified, since their father's death, she would call him if "she needed advice on her professional career[,] . . . financial advice[,] . . . [or] when she just want[ed] some life advice . . . ."

With respect to his sister's personal life in 2013, Garcia testified "she was having a hard time with the relationship between her and [defendant]" because "she always seemed to make ends meet" when she was by herself. Garcia suggested to her a few basic financial management measures such as "writing everything down, making sure . . . not to spend money before you had it . . .

A-5809-17

24

[and] [p]ay in cash." Defense counsel objected to this testimony as irrelevant to the question of what cause decedent's death. The judge overruled the objection.

In response to this line of questions, Garcia testified that, in 2013, decedent "would routinely ask [him] for money, be it for groceries, be it for things around the house, but that's also when she started asking me [about] money because she wanted to be able to take money out of her 401-K." Defendant was not involved in most of these conversations. Garcia testified, however, he intentionally made defendant ask him for money on one or two occasions "just so it would . . . drive the point . . . if you need money . . . you can't keep telling my sister to ask me. You . . . have to be able to take care of this by yourself."

The prosecutor also asked Garcia to describe what his sister told him about her relationship with defendant.

> She told me that they weren't sleeping in the same bed anymore, that she would usually be sleeping on the couch with my nephew, her son . . . . She would tell me . . . it was just so hard where it's almost . . . like he was pretty much dragging her down because it was just so hard. She actually said she couldn't even leave him by himself because . . . she didn't feel comfortable leaving [their son] with him.

Defense counsel again objected to this line of questioning. At sidebar, defense counsel was particularly concerned "about my client not being able to

be with his son. I've never heard that before." The judge responded: "Neither did I." The judge reviewed the order entered after the N.J.R.E. 104(a) hearing and found there was "[n]othing about fearing to leave him alone with the child." At defense counsel's request, the judge struck this part of Garcia's testimony and gave the jury the following instruction: "Alright, I'm instructing the jury to disregard the last statement by the witness regarding Monica being afraid to leave the child alone with the defendant. And that will be stricken from the record."

Garcia testified money was the initial cause of the marital discord. The rift in the relationship escalated to physical violence "probably in March, April -- like in May or June" 2014. Garcia claimed he "would get phone calls about [defendant] . . . hitting her -- she did say she was threatened with a knife once and this was the time I told her, you know, you need to go the police and these are the things you need to tell them." When asked how decedent reacted to his suggestion to report defendant's conduct to the police, Garcia stated:

> [S]he was hesitant. She didn't want to go to the police. She was very scared that . . . she told me that you know if I go to the police he said he was going to hit himself, he's going to get bruises and he's going to say that he's the one that got hit, not me.
>
> Q. Did she express any other reasons for not wanting to go to the police to report the defendant hitting her?

A.  She -- she said that she -- that he knows -- he knows how the system works.  This is -- and he can get away with it and not even just away with it, you know she would be the one that was going to be blamed for it.  And . . . it always revolved around the child . . . .  It always revolved around I don't want to lose [the child] and everything that she stayed for, was always about [the child].  You know I want [the child], you know I want him to have a whole family.  I want him to have a father and so he was -- she was scared that she would lose [the child] and that was the -- and then after that she -- since she got into trouble, when there was another incident when I got a phone call from her and I told her if you don't report this, it's like nothing ever happened and it's -- if you think it's bad now, it's just going to get worse and since she got into trouble, she didn't want to call the police because she was afraid now that you know she was -- she got arrested for something now, if she calls the police, now it's -- she was worried that what she was -- that it was just going to get worse.

Q.  Now you said that she told you that she didn't want to report it because the defendant knew how the system worked.  What did she mean by that?

A.  The family is a family of police officers.  She, you know the -- her -- his mother is a police officer, he worked as a dispatcher --

This prompted another objection by defense counsel.  At sidebar, defense counsel argued the witness was limited to relating what decedent told him, not what she meant to say.  The judge agreed and explained to the jury:  "The objection is sustained as to why Monica did not want to go to the police as

A-5809-17

27

speculation." When the prosecutor rephrased the question, Garcia responded Ms. Montone said defendant would hit and injure himself and claimed she was the aggressor.

Garcia testified his sister's life in 2014 was in chaos. Her car had been impounded and her driver's license had been suspended for numerous driving violations. He spent a week with her "to get everything ready so she can go back to work and you know tried to get her life straightened out." However, his efforts proved to be futile. She called him numerous times "saying you know he hit me again . . . pick me up, I'm ready to go." While en route, however, she would call him back and say "oh it's okay, it's okay, you don't need to -- you don't need to come . . . I'll take care of it, I'm going to try to make it work." Garcia testified decedent did not have a phone at the time. She communicated with him using her neighbor's phone.

Garcia also communicated with his sister by email. He testified he received approximately ten emails from her during June 2014. The State admitted into evidence the emails Garcia exchanged with his sister from June 25, 2014, through June 30, 2014.[6] Decedent acknowledged her

---

[6] Defense counsel made clear for the record his continuous objections to the admission of this hearsay testimony.

A-5809-17

dysfunctional lifestyle in these emails. Garcia purchased a cellphone for her and agreed to pay the carrying charges until she could pay for herself. Garcia last spoke to decedent at the end of July or the start of August 2014. He "was concerned about what was happening as far as when she got caught shoplifting." She anticipated the court would impose a probationary sentence conditioned on performing community service.

On cross-examination, Garcia admitted that, notwithstanding his sister's allegations of consistent physical abuse by defendant, he never saw any visible injuries on her person. He also admitted he first became aware of his sister's drug addiction toward the end of March 2014. Until then, he only knew she took Xanax for anxiety. She never told him, that in addition to Xanax, she abused, and was addicted to, cocaine and heroin. Garcia further testified his sister would usually ask to borrow money when she called about her marital problems; "the conversations [would often] meld together."

Testimony of Valesca Arriaga

Valesca Arriaga was thirty-seven years old at the time of trial. She testified she knew decedent for fourteen years and described her as "my best friend." They met when they both worked at a retail store while they attended college and "developed a very close friendship like I would consider her like my

sister." Arriaga testified decedent "was very much in love" with defendant at the start of their relationship. However, their relationship became volatile over time. "[T]his was just not a normal relationship, it was too many fights. They were always breaking up, getting back together. As years progressed it just got worse."

The prosecutor asked Arriaga if decedent ever discussed her "relationship or her marriage" and whether "defendant got physical." She responded the relationship "was getting physical" when defendant started taking painkillers and other drugs. The situation was "getting out of control and their fights were getting bigger and bigger as he took more." When asked whether decedent also took drugs, Arriaga testified she "had taken some in the past but nothing towards addiction." When the prosecutor asked her: "How do you know that?" Arriaga responded: "Because she was my friend."

According to Arriaga, decedent "[o]occasionally smoked some weed, marijuana, and from time to time she did cocaine." Arriaga also admitted she ingested cocaine with her at a Christmas party the year before she died, but it was "not excessive . . . and there was nothing out of control from both sides." She said it was decedent's cocaine, but it was procured by defendant.

At this point, the prosecutor returned the inquiry to the alleged physical altercations between decedent and defendant. According to Arriaga, decedent "finally opened up" to her and claimed defendant "was getting aggressive . . . [and] head butted her at one occasion . . . ." The second act of aggression by defendant allegedly involved "a pretty severe fight . . . ." Arriaga claimed decedent told her over the phone: "It was . . . [nighttime] and they started fighting and he started going crazy and started throwing stuff and across the room and pinned her against the wall." This alleged altercation occurred in the house they shared as husband and wife in Jersey City. Critically relevant to this case, Arriaga testified decedent told her defendant "started strangling her."

> Q. And what happened -- what did she tell you happened after he started strangling her?
>
> A. Thank you. She said she felt like she was going to pass out and she felt like her father had passed away and she felt like that he was being her guardian angel and that he saved her and that the baby at that time was trying to like tap [defendant] on his ankles trying to see if he could get like the attention.[7]

---

[7] The trial judge had previously ruled this entire testimony highly prejudicial and inadmissible under N.J.R.E. 404(b). Although defense counsel did not object, as explained in Section III of this opinion, [i]t is the independent duty of the court to ensure that the jurors receive accurate instructions on the law as it pertains to the facts and issues of each case . . . ." State v. Reddish, 181 N.J. 553, 613 (2004).

Q. Did Monica tell you anything else about that incident?

A. She just felt like that . . . she told me she was scared for her life at that time.

Without identifying when this alleged altercation occurred, Arriaga testified this was "the biggest one." She also claimed the couple "constantly fought all the time and . . . there were several incidents that there were a lot of things thrown around the house. . . . They would argue like pretty much every night." When asked how show she knew about the condition of the house, Arriaga again claimed, without identifying a date or time, that "[t]here was one incident . . ." that [she] went inside to help her with the baby's things . . . ."

She testified the fights between the couple led Ms. Montone to go to her house "somewhere between three to four times." When asked if she ever saw bruises on decedent's face after a fight, Arriaga alleged "[t]here was one incident where I did see . . . she had like a scab, a huge scab . . . ." Defense counsel objected at this point. At sidebar, defense counsel reminded the judge, that after the N.J.R.E. 104(a) hearing, he found Arriaga's testimony about a scab on decedent's face inadmissible. The judge confirmed defense counsel's claims and sustained the objection. The judge instructed the jury to "disregard the remark

of the witness regarding an observation of a scab on the victim's arm. That [testimony] will be stricken."

November 2013 was the last time decedent spent the weekend in Arriaga's home after defendant allegedly hit her. Arriaga testified decedent told her she wanted to leave defendant. She was ambivalent, however, about which path to follow because "she loved him very much . . . ." Arriaga noted that in the year before her death, decedent lost an excessive amount of weight and "looked miserable. She looked lost."

The last time Arriaga saw decedent was in December 2013, eight months before her death. This estrangement was unusual, according to Arriaga, "because we saw each other all the time." When the prosecutor asked her if decedent ever told her about the nightly arguments she had with defendant, Arriaga testified: "a lot of it was [based on] his drug addiction and their financial problems." She believed the financial problems were rooted in the fact that they were both unemployed. The only thing Arriaga remembered about the drug problem was that defendant abused Xanax and he "became the monster that he was back then." (Emphasis added). Arriaga testified "monster" was the exact word decedent used.

A-5809-17

Arriaga counseled decedent to seek support from her mother and brothers and told her to call the police. But she always declined because, according to Arriaga, she was afraid to ruin his career because "he wanted to be a cop . . . in Jersey City and that was the reason . . . they moved . . . back to Jersey City." She also did not want to alienate defendant from her family.

Although she last saw decedent in December 2013, Arriaga testified she talked to her on the phone "all the time" in 2014. They talked about her leaving defendant, moving to a condominium her mother purchased, and getting a fresh start. Arriaga also acknowledged decedent remained ambivalent about ending her relationship with defendant. "[T]here were times where she wanted to work things out with [defendant] . . . but when she tried it . . . wouldn't work out, that's when she always went back to that plan that we had . . . ." At other times, she wanted Arriaga to move in with her to help her with child rearing chores. Arriaga testified the last time she spoke with decedent was on a Wednesday, five days before her death.

Defense counsel began his cross-examination by asking Arriaga whether decedent mentioned, on the Wednesday before her death, that she and defendant "were getting matching tattoos?" Arriaga responded: "No." Counsel then asked Arriaga if she found out about it at some later time. Again she answered, "No."

On the subject of drugs, Arriaga testified she and decedent would "from time to time" inhale cocaine but she did not know whether Ms. Montone smoked cocaine or snorted heroin.

The judge did not give the jurors any limiting instructions to guide and restrict how they should consider Arriaga's testimony. We also note the conspicuous absence in Arriaga's testimony of any discussions or plans to address decedent's severe drug addiction to heroin, cocaine, and Xanax. All three of these powerful, highly addictive substances were in decedent's system at the time of her death. It is undisputed both parents' addiction to these powerful, illicit drugs placed their infant son in a highly precarious situation. The record shows, however, the attorneys did not ask Arriaga any questions about how someone who considered herself decedent's "best friend" missed this central, and, arguably, dispositive issue in her life.

Testimony of Eric Seeley

Eric Seeley was the final witness to testify regarding decedent's relationship with defendant. Seeley and decedent began working at Wachovia Bank about five years before her death. Like the three witnesses who preceded him, Seeley described the couple's relationship as "rocky" and "[s]ometimes she would say things were great and other times she would say they were horrible."

A-5809-17

35

Shortly after she married defendant, Seely testified decedent called him one night and told him "things [were] really bad . . . and you know I [need] to get better." When he asked her if defendant had done anything to her, "she said he was good, she just said the drugs are bad." (Emphasis added). Paradoxically, she also told him defendant "choked her" one time but then said, "I don't think he ever hurt me . . . it was just a [onetime] thing . . . ." She then would either change the subject or directly say she did not want to talk about it. Seeley did not remember when this conversation took place. Seeley testified, the night decedent called him, she also said her brother came and took her out of the house. According to Seeley, "we talked [every day] after that."

Through these conversations, Seeley learned she returned to the marital residence. Her family "caught her there and were upset and she said she just didn't want to keep the baby away from [defendant], it's not fair if he's the father." Decedent also told him "she was taking oxycodone thirties."[8] She would then claim, "she was getting herself clean, she was getting herself back together and she was kind of all over the place." Her mood dramatically changed from being "an amazing bubbly happy girl to like down on myself, I'm not happy."

---

[8] "Oxycodone thirties" is a colloquialism for oxycodone thirty milligram tablets.

A-5809-17

36

Returning to his earlier reference about defendant choking decedent, the prosecutor asked Seeley:

> Q. Now you said that the first time you had heard from Monica after her marriage she told you about an incident where the defendant had choked her. Did she ever talk to you after that night about the defendant physically abusing her?
>
> A. No, not really. She just kind of blew it off. She would just say he's crazy or you know, . . . but she wouldn't go into detail with me. I don't know why, I guess she just didn't want to tell me that part of it but she would just say you know he's crazy. I got to stay away from him today, he's crazy, I'm hiding or something like that.

Two or three weeks before her death, at around two o'clock in the morning, Seeley received "this long message" from decedent stating she wished he would come save her, "get me out of this place. I really need to get out of here. I want to change my life, I want to start over. I just wish somebody would come get me . . . ." He last spoke to her two or three days before she died. He characterized the call as "just a normal conversation." In response to the prosecutor's questions, Seeley reaffirmed he was aware she was taking oxycodone thirties. "She said Kevin sold them at the time and she was taking them with him." Defense counsel objected to this last statement. The judge

A-5809-17

37

sustained the objection, struck it from the record, and directed the jury "to disregard the last answer from the witness."

On cross-examination, Seeley revealed, for the first time in his testimony, he was aware decedent was using cocaine in addition to oxycodone. He did not know she was also using heroin. He also agreed with defense counsel's description of Ms. Montone, that she "looked to you that like she was somebody that was abusing drugs." Seeley was also not aware decedent and defendant had "gotten tattoos on their fingers" days before her death. At the end of Seeley's testimony, the judge asked defense counsel if he wanted him to give the jury a limiting instruction. Counsel responded: "I'm not asking for it now."

## II.

Defendant's trial strategy was predicated on decedent's cause of death. Defense counsel made this clear in his opening statement to the jury.

> Kevin Montone did not kill his wife. No one killed his wife because she didn't die from strangulation. She died of a drug overdose. And you don't know that because I'm saying it to you, you'll know it because you're going to hear the testimony in this case that shows you that.

To rebut this defense, the State called, as an expert witness, forensic toxicologist Ralph Gagliano. As he explained, "[f]orensic means pertaining to law. Toxicologist means we analyze specimens for drugs." In this case, the

A-5809-17

38

medical examiner asked the state toxicology laboratory to perform a toxicology analysis of decedent. Gagliano testified he did not personally do the analysis, but reviewed the work performed by the laboratory staff to ensure the quality of the analysis.

According to a report dated August 20, 2014, the laboratory received the following biological specimens in connection with this case: "femoral blood one, femoral blood two, urine, bile, vitreous, brain, liver[,] and stomach content." Gagliano defined "femoral blood" as blood extracted from an artery in the leg. He also defined "volatiles" as "alcohols, methanol, ethanol, acetone and isopropanol." According to Gagliano, the biochemical test performed in this case would identify various groups of drugs, including "amphetamines, barbiturates, cocaine, [phencyclidine], opiates, tricyclic, antidepressants."

In this case, the toxicology report was negative for volatiles, but positive for "[benzoylecgonine,] which is a metabolite of cocaine[,] . . . morphine and . . . [alprazolam]." Gagliano explained:

> A. [Benzoylecgonine] was 0.62, zero milligrams per liter. Morphine was 0.063 milligrams per liter and [alprazolam] was 0.047 milligrams per liter.
>
> Q. Can you tell us what [benzoylecgonine] is?
>
> A. It's a metabolite of cocaine.

A-5809-17

Q.  And what's a metabolite?

A.  It's the breakdown product . . . cocaine metabolizes to [benzoylecgonine]

Q.  Okay.  And is there any significance to metabolization of cocaine?  Does that suggest anything?

A.  No, all drugs will normally metabolize in your body.

Q.  Okay.  And the levels that you described, is there any significance to those levels in the femoral blood?

A.  [Benzoylecgonine] is an inactive metabolite.  It doesn't show any activity such as cocaine would give you numbness or whatever, [benzoylecgonine] doesn't have, it's not active.  Morphine, therapeutic is up to .1 so this is well within the normal therapeutic range. [alprazolam] is also therapeutic up to .1 so this is also within the therapeutic range.

A urine screening found codeine, cocaine, benzoylecgonine, morphine and 6-monoacetylmorphine (6-MAM).  Gagliano testified the level of "[c]odeine was 0.303.  Cocaine was 6.418.  Benzoylecgonine was 35.711.  Morphine was 3.539.  [6-MAM] was 0.910 . . . milligrams per liter on all of them."  When asked to explain the significance, if any, of these levels, Gagliano explained:

In urine, levels are difficult to interpret because of your -- how hydrated you are, how much urine you put out. So[,] a very dehydrated person could have higher levels, a very hydrated person could have lower levels. Urine levels aren't really very significant.  They just

A-5809-17

40

show the recent presence of -- recent use of the drugs
by a person.

On cross-examination, Gagliano explained the reference to "therapeutic levels" of various substances in decedent's femoral blood or urine: "[this] means a range where a drug has its desired effect. So[,] people do use morphine. People are prescribed morphine so they have a reference range[,] so we know what is therapeutic, what is toxic, what is lethal." Defense counsel ended his cross-examination of this witness as follows:

Q. -- you're interpreting that [toxicology report], right?

A. Correct.

Q. Okay. While you're looking at that, that would be indicative of somebody that had ingested heroin and heroin breaks into these components, to these metabolites after this person ingests them, right?

A. Correct.

The court reconvened after the lunch break. Before the jury entered the courtroom, defense counsel addressed the court to object to the testimony of the State's toxicologist. Counsel claimed Gagliano "testified to some things that didn't appear anywhere in any report and quite frankly he just made them up." The judge responded that defense counsel "opened the door" when he asked Gagliano about the therapeutic effect of narcotics. Defense counsel argued the

concept of a therapeutic level of cocaine or heroin was a total fabrication by Gagliano.

> DEFENSE COUNSEL: There is absolutely no support for the nonsense that that man just testified to. And the fact that they put that out there before the jury, I asked him a question knowing full well he would talk about a therapeutic level which is total hogwash.

> THE COURT: Frankly I don't think the [S]tate knew he was going to say that because I don't think they were prepared for that. If they did, that would -- you know they would [have] address[ed] that earlier.

Defense counsel inferred from the judge's statement that the State did not anticipate Gagliano's testimony as a toxicologist would include the concept of a "therapeutic level" of heroin and cocaine. This triggered a highly energized, and at times combative, exchange between defense counsel and the trial judge. Ultimately, defense counsel moved to strike Gagliano's testimony "because it was a surprise." The State did not disclose to defendant that the toxicologist was going to testify about acceptable "therapeutic levels" of illicit narcotics. Defense counsel argued the prosecutor should be found actually or constructively aware of Gagliano's testimony because he was a witness for the State. The judge denied defendant's motion to strike Gagliano's testimony.

The medical examiner is the official title of a forensic pathologist who is employed by a government agency. Dr. Di Wang is a forensic pathologist who

A-5809-17

42

at the time of trial was employed by the Attorney General as an assistant medical examiner at the North Regional Medical Examiner's Office. Dr. Wang was admitted by the court as an expert in the field of forensic pathology without objection. At this point, the State moved into evidence, without objection, an anatomy chart of the internal structure of the neck area. Dr. Wang confirmed the chart was "a fair and accurate representation of the anatomy of the neck area."

Dr. Wang conducted a postmortem examination and autopsy of Ms. Montone on August 19, 2014, the day after she died. To support his original report, Dr. Wang testified he took approximately 168 photographs of decedent focusing on various parts of her anatomy. He took eight more photographs "on the fixed neck muscles" for his second report which he completed at a later time.

Decedent was five feet one inch tall and weighed 135 pounds at the time of her death. In his initial findings Dr. Wang noted "blood smears on the face and on the clothing. There were foams in the mouth and . . . injuries on the face." In the course of Dr. Wang's testimony, the State published to the jury numerous photographs of decedent's anatomy after they had been surgically exposed during the autopsy.

A-5809-17

Dr. Wang also reviewed the toxicology test report, reflecting decedent's blood contained metabolized cocaine, morphine, metabolized from heroin, and alprazolam, a type of benzodiazepine. [9] A toxicology analysis of her urine found codeine and 6-MAM, both of which are components of heroin. "So basically . . . there were three component[s]. One is heroin, one is cocaine[,] and one is benzodiapan." Dr. Wang opined the presence of these drugs in decedent's system did not cause her death.

> Because these drugs, no matter the concentration[,] . . . the drugs [do] not cause the neck hemorrhage. A drug does not cause the petechia in the eyes. The drug does not cause the abrasions on the face. The drug does not cause the hemorrhage in the tongue. And of course[,] the drug does not cause the contusion in the arms. . . . [S]ometime[s] [drugs] can cause death for [a] different person, yes. The level could be different. Sometimes its lower or high[er], they could cause a person's death[,] but in those type of case[s], there is no . . . other injury being found or there's no typical injury being found.
>
> In this case, there are many findings. They [all] fall into the category or the diagnosis of asphyxia by neck compression and these findings, they are classic. Even though they are not [one] hundred percent because . . . no case will give you a hundred percent of a feature of neck compression.
>
> And the neck compression is a type of blunt force injury. And basically[,] it's equivocal to [sic][,]let's

---

[9] Xanax is the brand name for alprazolam.

A-5809-17

44

> say[,] [a] gunshot injury to the head or a stab wound to the chest. It's just different type of injury. A gunshot wound is a type of blasting force. Then the knife is a type of sharp force. Then the asphyxia by neck compression is a type of blunt force.
>
> So with all [this] clear evidence, the drug did not contribute to Ms. Montone's death.

Dr. Wang opined, within a reasonable degree of medical certainty, that the manner of death was asphyxia due to neck compression, and the cause of death was homicide.

In response to defense counsel's questions, Dr. Wang agreed the average size of a normal female heart is in the range of 250 to 350 grams. Decedent's heart, however, was measured at 379 grams. Dr. Wang also noted decedent had an increased lung size. Her right lung weighed 558 grams and the left lung was 398 grams. When defense counsel asked if these were "common findings in cases where people have died of drug overdoses," Dr. Wang responded: "Yes, could be." The doctor also confirmed decedent had urine in her bladder at the time of her death. Defense counsel asked Dr. Wang if it is a common occurrence for a person who is getting strangled to "void . . . whatever urine they have in their system." Dr. Wang stated that "[i]n some cases there's urine, like this case" but in other cases there is not. Urination is not "clearly associated with the cause of death."

A-5809-17

45

Dr. Wang conceded there are "common signs" associated with death by strangulation that are not present in this case. These are: fractured hyoid bones; a fracture of the cartilage in the larynx; fracture of the thyroid cartilage; the absence of "fingernail marks or anything on the neck of [the decedent] indicating that she tried to do anything to pry anyone's hands off of her." Decedent did not have any of these injuries. Ultimately, Dr. Wang remained resolute. As a forensic pathologist, he opined, within a reasonable degree of medical certainty, that Ms. Montone died from strangulation. The State rested at the end of Dr. Wang's testimony.

Defendant called Dr. Zhongxue Hua, who was then Acting Medical Examiner in Bergen County. He was admitted as an expert in the field of pathology without objection. After reviewing the pathology report submitted by Dr. Wang and the toxicology analysis, Dr. Hua opined decedent did not die from manual strangulation. He opined the cocaine, heroin, and Xanax in her system could have had a synergistic effect causing an acute intoxication which could be lethal. After reviewing the photographs of the scene, the autopsy photographs, and the toxicology report, Dr. Hua opined, within a reasonable degree of medical certainty, that Ms. Montone died from an acute intoxication brought about by ingesting cocaine, heroin, and Xanax.

Brian Markey was defendant's second and last witness. He testified he knew defendant since 2009. Markey owned and operated a tattoo establishment named BC Tattoo in 2014. He tattooed defendant's and Ms. Montone's initials on their ring fingers in 2014. Defendant opted not to testify in his own defense.

## III.

Against this factual backdrop, defendant raises the following arguments.

POINT I

THE TRIAL COURT ERRED BY IMPROPERLY ADMITTING THE HEARSAY STATEMENTS OF MONICA MONTONE INTO EVIDENCE.

A. The Trial Court Erred By Finding That Mr. Montone Had Asserted An Accident Defense to the Murder Charge.

B. The Hearsay Testimony Regarding Ms. Montone's Statements Was Irrelevant to the Matters at Issue in the Trial.

C. The Trial Judge Erred By Failing to Properly Issue Limiting Instructions Upon the Introduction of Each of the Hearsay Statements.

POINT II

THE TRIAL COURT ERRED BY PERMITTING THE ADMISSION OF HEARSAY STATEMENTS OF

A-5809-17

47

MR. MONTONE'S TWO-YEAR OLD SON.

POINT III

THE TRIAL COURT ERRED BY ADMITTING AN OVERWHLEMINGLY LARGE NUMBER OF CRIME SCENE PHOTOS OF MR. MONTONE'S HOME AND OF THE DECEDENT.

POINT IV

THE TRIAL COURT ERRED BY FAILING TO STRIKE THE FALSE TESTIMONY OF THE STATE'S TOXICOLOGY EXPERT.

POINT V

THE TRIAL COURT ERRED BY IMPROPERLY GIVING THE JURY A "FALSE IN ONE, FALSE IN ALL" INSTRUCTION WITH RESPECT TO THE TESTIMONY OF MR. MONTONE'S EXPERT MEDICAL EXAMINER.

We agree the trial judge misapplied the Supreme Court's holding in <u>Scharf</u> by admitting highly prejudicial hearsay testimony under the state of mind exception codified in N.J.R.E. 803(c)(3). This error extended when he allowed two DCPP caseworkers to testify about words allegedly uttered by defendant's two-year-old son. The erroneous admission of this highly prejudicial hearsay evidence denied defendant's right to a fair trial.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the

matter asserted." State v. Brown, 170 N.J. 138, 148 (2001); N.J.R.E. 801(c). Hearsay is presumptively inadmissible in a trial "except as provided by these rules or by other law." N.J.R.E. 802.

On October 21, 2016, and March 31, 2017, the judge conducted an N.J.R.E. 104(a) hearing to determine the admissibility of hearsay testimony from certain individuals the State sought to call as witnesses at defendant's trial. Over defense counsel's objection, the judge decided to allow the State to present hearsay testimony based on the state-of-mind exception codified in N.J.R.E. 803(c)(3), which provides:

> A statement made in good faith of the declarant's then-existing state of mind, emotion, sensation or physical condition (such as intent, plan, motive, design, mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

The best way to illustrate how the state of mind exception in N.J.R.E. 803(c)(3) was misapplied here is to describe how it was properly applied based on the salient facts in Scharf.

At around eight o'clock in the evening of September 20, 1992, police officers from the Palisades Interstate Parkway responded to a call that a person had fallen from the cliffs. Scharf, 225 N.J. at 554. The defendant in Scharf met

A-5809-17

49

the officers when they arrived and told them his wife had accidently fallen from the Englewood cliffs.  Id. at 555.  He guided the officers down "an unmaintained and overgrown path into a wooded area" until he reached a flat rock that protruded from the cliff.  Id. at 554.  The defendant told the officers that was the precise location where his wife fell.  Ibid.  Forensic examination of the corpse established the time of death and found she had a blood alcohol content of 0.12%.  Ibid.

Police investigators interviewed the defendant a few days later.  Id. at 555.  He told the investigators he and his wife originally planned to go to New York City that night, but then made an impromptu decision "to make a detour to the cliffs."  Ibid.  After drinking in their car, they walked "down the trail, climbed through the fence, and sat on the flat rock that he had shown to the officers earlier."  Id. at 554-55.  According to the defendant, they were engaged "in amorous activities," when she felt "uncomfortable," so he offered to get her "a blanket and some wine from the car."  Id. at 555.  They both "stood up, and then [the victim] suddenly fell forward off the rock . . . he called her name but received no response."  Ibid.

The police continued to investigate.  While interrogating the defendant, he revealed that, two weeks before his wife's death, she served him "with a

A-5809-17

50

divorce complaint that alleged [the] defendant was abusive and unfaithful." Id. at 555. The defendant also told the investigators his wife "was a heavy drinker and that both he and she had dated other people as part of an open marriage." Ibid. He also claimed he had "ended his relationships with the other women and hoped that a 'trip to the cliffs' would lead to [their] reconciliation." Ibid.

Interviews of the victim's friends and acquaintances, however, caused the police investigators to question the defendant's account of events, including her "state of mind, her activities, and her interactions with defendant leading up to her death." Ibid. The investigators testified the defendant's "responses to repeated questioning revealed inconsistencies, including differing versions of how the fall occurred, and some inculpatory indications." Id. at 556. Despite these inconsistencies, the medical examiner remained uncertain about whether the "manner of death" was homicide and wrote "pending investigation" on the death certificate. In 1993, he amended the "manner of death" to "could not be determined." Ibid.

After further investigation in 2004 and 2007, the medical examiner amended the "manner of death" on the death certificate from "could not be determined" to "homicide" and defendant was indicted for first degree purposeful and knowing murder. Ibid. "[D]efendant proffered a defense of

accident[,]" suggesting his wife accidentally fell from the cliff rather than him intentionally pushing her to her death. Id. at 557. In this light, the State presented evidence to rebut the defendant's account that his wife's death "was due to an unfortunate accident that took place when he and she were alone on the cliffs on the evening of Sunday, September 20, 1992." Ibid.

The state of mind evidence the prosecution presented at trial in Scharf included discussions the victim had with her friends and concerns she relayed to her psychotherapist. The trial court admitted, under N.J.R.E. 803(c)(3), the therapist's testimony in which she asserted the victim refused the defendant's invitation to go on a picnic to the Palisades and claimed she had never been to that area of the park. Id. at 558.

The defendant's claim that his wife died from an accidental fall made hearsay evidence of her state of mind shortly before her death relevant and ultimately admissible. As the Court explained in Scharf, "when a matter places a declarant's state of mind at issue, [N.J.R.E. 803(c)(3)] allows a declarant's out-of-court statement to be admitted for that singular purpose." Id. at 569 (citing State v. Benedetto, 120 N.J. 250, 255-56 (1990)). Hearsay testimony based on the victim's state of mind must also be relevant and "bear[] a logical connection to the issues at trial." Id. at 569 (quoting State v. McLaughlin, 205 N.J. 185,

189 (2011)). Furthermore, "declarations of fear" are admissible only "'to establish[] that the decedent was not the aggressor, did not commit suicide and was not accidently killed,' provided that those matters satisfy the relevancy requirement." Id. at 570 (alteration in original) (quoting State v. Machado, 111 N.J. 480, 485 (1988)).

This exception to the exclusion of hearsay evidence must be cautiously applied. Thus, state-of-mind hearsay testimony about a decedent's prior statements has been admitted only "when accident is proffered as the explanation for a death . . . ." Ibid. In Scharf, Justice LaVecchia relied on the analytical approach employed in United States v. Brown, 490 F.2d 758, 767 (D.C. Cir. 1973) to explain

> courts have developed three rather well-defined categories in which the need for [state-of-mind] evidence overcomes almost any possible prejudice: (1) when a defendant is claiming self-defense; (2) when a defendant proffers a defense on the ground that the deceased committed suicide; and, of relevance to the present appeal, (3) when a defendant claims that there was an accidental death.
>
> [Ibid. (alteration in original) (emphasis added) (quoting Brown, 490 F.2d at 767).]

The trial judge in Scharf properly admitted the hearsay statements presented by the State because the statements: (1) were "close enough in time

to enhance their probative value;" (2) were a direct response to the defendant's "narrative that this was all just an accidental death;" and (3) were sufficiently reliable to allow the jury to assess their probative value for this limited purpose. Id. at 573.

Here, the threshold and underlying dispositive question that loomed from the start concerns the mischaracterization of defendant's legal position related to his claim of innocence. Unlike the defendant in Scharf, defendant did not raise the defense of accident in response to the State's charge. Here, the State's theory of culpability required the jury to find defendant intentionally or knowingly strangled his wife in the presence of or nearby his two-year-old son. Under these circumstances, defendant's trial strategy was not predicated on his wife being accidentally strangled.

Defendant has consistently maintained his wife had a serious addiction to illicit narcotics and died from a self-induced overdose. It is now well-settled that drug addiction is a disease that, since 1999, took the lives of more than 841,000 people nationwide.[10] Our own State is not exempt from this dreaded

---

[10] Opoids: Data, Ctr. Disease Control & Prev., https://www.cdc.gov/opioids/data/index.html (last visited Dec. 20, 2021). There were "67,367 drug overdose deaths in the United States" in 2018. Holly Hedegaard et al., Drug Overdose

disease nor its consequences.[11]  The record reflects neither the State nor the trial judge were able to grasp this fundamental point.

Writing for a unanimous Court in <u>Scharf</u>, Justice LaVecchia urged a cautious approach to the admission of state of mind evidence.

> When it comes to an expression of fear by the out-of-court declarant, the state-of-mind exception is analyzed carefully concerning its relation to the issues at trial and whether the hearsay should be permitted for a limited use.  <u>The state-of-mind exception to the hearsay rule does not broadly allow admission of a victim's recounting of a defendant's threats</u>.
>
> However, declarations of fear can be admitted "to establish[] that the decedent was not the aggressor, did not commit suicide and was not accidently killed," <u>provided that those matters satisfy the relevancy requirement</u>.
>
> [<u>Id.</u> at 570 (alteration in original) (emphasis added) (citations omitted).]

Defendant's explanation for his wife's demise has never wavered.  Defense counsel's opening statement to the jury made this point unequivocally clear:  "No

---

Deaths in the United States, 1999–2018 (2020), https://www.cdc.gov/nchs/data/databriefs/db356-h.pdf.

[11]  In 2018, 2,900 New Jersey residents died from a drug overdose.  <u>2018 Drug Overdose Death Rates</u>, Ctr. Disease Control & Prevention: Drug Overdose, https://www.cdc.gov/drugoverdose/deaths/2018.html (last visited Dec. 17, 2021).

one killed his wife because she didn't die from strangulation. She died of a drug overdose." Defendant's pathologist Dr. Hua opined: Ms. Montone died from an "acute intoxication" brought about by ingesting cocaine, heroin, and Xanax. This is not the functional equivalent of the "accident" defense in <u>Scharf</u>.

Three of the four witnesses who testified for the State under N.J.R.E. 803(c)(3) were entirely unaware of the seriousness of decedent's drug addiction at the time of her death. Catherine Talafous was entirely unaware of decedent's drug addiction because she only interacted with her for approximately thirty minutes, once in her life. Talafous's hearsay account of this superficial, brief encounter was highly prejudicial and lacked any probative value.

Decedent's brother Jose Garcia's testimony revealed decedent's chaotic lifestyle but only partly mentioned her drug use. He first became aware of his sister's drug addiction toward the end of March 2014, five months before her death. Until then, he only knew his sister was taking Xanax for anxiety. She never told him that, in addition to Xanax, she abused and was addicted to cocaine and heroin. The prejudicial effect of this testimony was exacerbated by the trial judge's failure to give the jury a limiting instruction following Garcia's testimony.

A-5809-17

Valesca Arriaga was the third witness called by the State to testify about decedent's state of mind. She knew decedent for fourteen years and characterized their relationship as "best friends." According to Arriaga, decedent "was very much in love" with defendant at the start of their relationship but the situation became very volatile over time. "They were always breaking up, getting back together. As years progressed it just got worse." With respect to decedent's drug use, all Arriaga saw decedent do was smoke marijuana "occasionally" and snort cocaine from "time to time." Arriaga noted, however, that it was "not excessive . . . and there was nothing out of control . . . ."

Arriaga testified decedent and defendant "fought all the time . . . ." This testimony was not only irrelevant to decedent's state of mind on the day she died, it allowed the witness to contaminate the record with highly prejudicial hearsay testimony the judge had previously found inadmissible. When asked if she ever saw bruises on decedent's face after a fight, Arriaga responded: "[t]here was one incident where I did see . . . she had like a scab, a huge scab . . . ." Defense counsel immediately objected and reminded the judge he had previously found Arriaga's testimony about a scab inadmissible. The judge confirmed he found this specific testimony inadmissible after a N.J.R.E. 104(a) hearing conducted almost a year earlier and sustained the objection.

The prosecutor continued this line of questioning and asked Arriaga if decedent ever told her that defendant had tried to strangle her. In response, Arriaga testified decedent told her defendant had tried to strangle her causing the following near-death experience:

> She said she felt like she was going to pass out and she felt like her father had passed away and she felt like that he was being her guardian angel and that he saved her and that the baby at that time was trying to like tap [defendant] on his ankles trying to see if he could get like the attention.

Inexplicably, defense counsel did not specifically object to this part of Arriaga's testimony.[12] The appellate record shows the judge had also previously ruled this part of Arriaga's testimony inadmissible under N.J.R.E. 404(b) after conducting a N.J.R.E. 104(a) hearing several months before the start of trial. The judge explained the basis for his ruling in the following written statement of reasons:

> Likewise, although Valeska Arriaga's . . . [testimony] at the evidentiary hearing conducted by this [c]ourt on October 21, 2017[,] that Monica called her and stated that the [d]efendant choked her, the State failed to establish said act by clear and convincing evidence. This alleged act was an uncharged, uncorroborated act, which [Arriaga] failed to specify the date, time, location, or personal observations of the [d]efendant's

---

[12] Defense counsel preserved for the record his continued objection to the admission of hearsay testimony.

A-5809-17

58

alleged physical abuse of Monica. Though [Arriaga] testified that she once observed a burn mark or scab on Monica's arm, such an injury is not consistent with the alleged choking, and [Arriaga] failed to testify as to whether she observed Monica after the [d]efendant's alleged act. As such, the State failed to establish by clear and convincing evidence that the [d]efendant choked Monica. <u>Finally, this act is potential propensity evidence and is therefore unduly prejudicial</u> pursuant to the fourth prong of the [<u>State v. Cofield</u>, 328, 338 (1992),] test. <u>Thus, this alleged prior bad act is inadmissible at the [d]efendant's trial</u>.

[(Emphasis added).]

Despite this clear ruling, the most prejudicial part of Arriaga's testimony remained part of the evidence available to the jury.

Decedent's coworker Eric Seeley's testimony was also inadmissible under the state of mind exception. Over defense counsel's objection, Seeley testified decedent and defendant had marital problems, and described their relationship as "rocky." He also testified that decedent told him that defendant choked her. This testimony was not relevant to defendant's trial strategy, that decedent died of a drug overdose. Seeley testified he knew decedent was taking oxycodone thirties and ingesting cocaine but was not aware of decedent's heroin use. On cross-examination, Seeley testified the last time he saw decedent, she looked like somebody who was "abusing drugs." Although a limiting instruction was

A-5809-17

59

not requested, Seeley's testimony, based principally on decedent's hearsay, compounded the prior witnesses' prejudicial testimony.

The hearsay testimony provided by Talafous, Garcia, Arriaga, and Seeley should have been excluded under N.J.R.E. 802 because the trial judge misapplied the state of mind exception under N.J.R.E. 803(c)(3) as explained by the Supreme Court in Scharf. The hearsay testimony of these four witnesses violated defendant's constitutional right of confrontation, lacked competent probative value, and its highly prejudicial effect irreparably tainted defendant's right to a fair trial.

IV.

The incompetent hearsay testimony of the two DCPP caseworkers, Simone Coombs and Shayna Bell, also significantly undermined defendant's right to a fair trial. Their hearsay account of words uttered by a two-year-old child after allegedly witnessing an emotionally traumatic event involving his mother's death is not competent evidence and should have been declared inadmissible under N.J.R.E. 802. When the testimony of the adult witness is derived from the words of an infant whose cognitive development is not known, the trial judge must first determine the infant's developmental competency to comprehend the need to tell the truth. N.J.R.E. 601.

"The New Jersey Constitution and the Sixth Amendment to the United States Constitution both 'provide that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" State v. Williamson, 246 N.J. 185, 203 (2021) (alteration in original) (quoting State v. Wilson, 227 N.J. 534, 544 (2017)).  Here, the State's reliance on the excited utterance exception to bypass this fundamental constitutional right is misplaced. An excited utterance is defined by our Rules of Evidence as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition and without opportunity to deliberate or fabricate."  N.J.R.E. 803(c)(2).  This presumes the declarant who experienced this traumatic event is otherwise competent to testify under N.J.R.E. 601.

Our Supreme Court has cautioned judges not to dilute our evidentiary requirements to admit at trial an out-of-court statement "that does not satisfy each element of the excited utterance doctrine, particularly when the declarant is not called as a witness and is available to testify."  State v. Branch, 182 N.J. 338, 367 (2005).  Mindful of this admonition, we take notice of a case in which the Family Part found a seven-year-old child with "the developmental cognition of a three-year-old," lacked the competency to testify on his own behalf in a sex

abuse case. The Family Part found the child "was not able to distinguish or to articulate what his understanding was between right and wrong or the consequences of not telling the truth." State in Interest of A.R., 234 N.J. 82, 94 (2018).

A.R. involved allegations of sexual abuse made by a seven-year-old, cognitively impaired child. The Supreme Court was asked to determine whether the child's video-recorded statement to a police detective was properly admitted under the then prevailing version of N.J.R.E. 803(c)(27). Id. at 97. The primary issue was whether the child's statement in the video was "trustworthy." Id. at 103. Writing for the Court, Justice Albin noted

> one consideration in assessing a child's mental state must be whether the child is able to distinguish between fantasy and reality and whether the child can communicate in a way that shows the child has the mental capacity to tell the truth and to be understood by the trier of fact. A judicial declaration that a child is incompetent to testify should also have some bearing on determining the admissibility of a child's out-of-court statement.
>
> [Id. at 104.]

The Court concluded the Family Part abused its discretion in allowing the video-recorded statement into evidence. Under the totality of the circumstances, the child's words were not sufficiently reliable to support the conclusion that the

account of the abuse was probably trustworthy.  Id. at 106.  Here, defendant argues the trial judge did not make any determination about the cognitive capacity of his two-year-old son or his ability to comprehend what occurred that day at any given moment.  Thus, the testimony of the two DCPP caseworkers proffered by the State should have been rejected under N.J.R.E. 802.  We agree.

Under these circumstances, this two-year-old child was presumptively incompetent to testify in a court of law under the standard codified in N.J.R.E. 601.  The judge did not make any findings about the reliability of the child's hearsay statement nor assess the trustworthiness of his purported perceptions.  The two DCPP caseworkers' testimony should have been excluded as inadmissible hearsay under N.J.R.E. 802.

## V.

Finally, defendant argues the trial judge abused its discretion by admitting into evidence "nearly one hundred and fifty crime scene photos" which, by their sheer number, created a prejudicial effect that far outweighed their probative value under N.J.R.E. 403.  When this was raised before the trial judge, the prosecutor argued:

> It should be noted that the defendant isn't just charged with murder, he's also charged with endangering the welfare of a child, specifically for creating an

environment which would make the [two-year-old] child victim . . . an abused or neglected child.

Having a home environment that has broken -- a broken television on the floor, given his age, given his size.

THE COURT: Numerous broken televisions.

PROSECUTOR: Numerous broken televisions throughout the house, broken items all over the house. Your Honor, it's relevant and it's probative to not just -- not specifically to the first count in the indictment, but really, Your Honor, to the endangering count which is why those photographs were introduced by the state.

. . . .

DEFENSE COUNSEL: Judge, it would be one thing to try and argue that but on the other hand, they are arguing propensity. She opens up to the jury and tells them what a violent man that he's punching holes in the walls, without any proof that he's the one who put the holes in the walls to begin with. Stabbing the wall with a knife? There's no testimony that's coming for that. So all the –

. . . .

PROSECUTOR: -- I didn't . . . attribute that. I said that there were signs of violence in the home, I did not attribute the broken television, the holes in the wall to the defendant. I simply stated the facts, that there were -- there were broken televisions in the home, there were broken mirrors, there were broken things all over the house.

A-5809-17

The judge reserved deciding the issue and told the attorneys to "mark what exhibits you want to address and I'll consider it . . . ." He also told the lawyers he would decide the admissibility of each photograph "when they're offered, and I'll hear the arguments regarding them . . . ."

N.J.R.E. 403 states:

> Except as otherwise provided by these rules or other law, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of:
>
> (a) Undue prejudice, confusion of issues, or misleading the jury; or
>
> (b) Undue delay, waste of time, or needless presentation of cumulative evidence.

As an appellate court, we afford trial judges broad discretion to determine the evidential value of any proposed evidence and review any claim of undue prejudice with substantial deference to trial judge's decisions. State v. Cole, 229 N.J. 430, 449 (2017).

Dr. Wang, the State's Medical Examiner, testified he took approximately 168 photographs of decedent's corpse, many of which graphically depicted various parts of her anatomy. Notwithstanding an extensive cross-examination by defense counsel, Dr. Wang opined, within a reasonable degree of medical certainty, Ms. Montone died from strangulation. This was the central and

dispositive issue in this case. As a means of making the complex medical evidence more accessible to the jurors, the prosecutor admitted into evidence an anatomy chart that showed the internal structure of the neck area.

The prosecutor asked Dr. Wang to step down from the witness box and use the anatomy chart "to point out for the jury where there are veins on this diagram that could be compressed and cause asphyxia due to neck compression[.]" Dr. Wang used a marker to circle the areas of the jugular veins that, if compressed, can block the blood returning to the heart or the brain and cause asphyxia. Relying exclusively on the anatomy chart, Dr. Wang explained that asphyxia, also known as strangulation, involves the compression of the neck that blocks the vessels, including the veins and arteries in the neck area. It may also be possible "to block[] the airway so in this way, there are different mechanism[s] but all these blockage[s] will lead to asphyxia."

When one or more jugular veins are compressed, it blocks the blood returning to the heart. When the pressure reaches "around four pounds PSI, per square inch or pound per square inch" it can break smaller vessels and cause hemorrhaging. To illustrate how little force is required to apply four pounds of pressure, Dr. Wang claimed, "the force to pull a trigger [of a firearm] is about seven pounds." He also testified it is probable that, "with time," a person can

lose consciousness if the jugular vein is compressed. At the request of the prosecutor, Dr. Wang used a red marker to circle the arteries on the diagram that, if compressed, could cause asphyxia.

Dr. Wang testified it takes eleven pounds of pressure per square inch to render a person unconscious.

> It's not universal for everybody. Some people they might have longer endurance, they're more resistant to a deprival of oxygen. Some people more susceptible to the deprivation of oxygen. So[,] it varies. But the . . . blockage of the artery would cause the relative quicker pass out time than the veins.

Although not universal, if the pressure is released within ten to thirty seconds, a person is likely to regain consciousness. Conversely, the longer the time of asphyxiation, "the higher the probability of the person could die." The prosecutor asked Dr. Wang to describe the kind of visible, external injuries he looks for as pathologist to opine a person may have died from asphyxia. Dr. Wang identified several indicators: (1) injury on the face, especially around the lips; (2) injury on the head; (3) mucosa inside the mouth; (4) injury on the external skin; and (5) injury to the muscles of the neck.

This testimonial evidence by Dr. Wang shows the State clearly supported its claim that decedent's manner of death was asphyxia due to neck compression and the cause of death was homicide. The admission into evidence of over fifty

A-5809-17

photographs graphically depicting decedent's corpse at the scene where she was found and of decedent's body after it was surgically exposed during various stages of the autopsy examination have little, if any, probative value when viewed by lay jurors. Conversely, the only reasonable inference that can be drawn about the probable reactions of an average lay juror to these photos would be shock, horror, disgust, outrage, and perhaps even a degree of morbid curiosity. It is well-settled that we review a trial judge's evidentiary rulings under an abuse of discretion standard. State v. Jackson, 243 N.J. 52, 64-65 (2020).

We are satisfied the judge mistakenly exercised his discretionary authority when he admitted into evidence these autopsy and crime scene photographs of decedent. The prejudicial effect inherently associated with the graphic nature of these numerous photographs far outweighed their dubious probative value. This evidence should have been limited under N.J.R.E. 403. On retrial, the judge should carefully review each of the photographs submitted by the State for admission into evidence and make specific findings under N.J.R.E. 401 and N.J.R.E. 403 to determine which photographs are probative, without redundancy, to avoid the potential for inflaming the jury.

## Conclusion

Defendant's conviction for first degree murder of his wife Monica Montone is reversed. The convictions for second degree endangering the welfare of a child and third degree possession of heroin are affirmed as unchallenged by defendant in this appeal. The sentence imposed by the Criminal Part on these unchallenged convictions stand. Based on the dispositive nature of our decision, we decline to reach defendant's remaining arguments attacking his murder conviction. The matter is remanded for a new trial on the charge of first degree murder.

Reversed in part, affirmed in part, and remanded for a new trial. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5809-17

69